

Charles N. Berry, Jr., Oklahoma City, Okl., for appellant, cross-appellee.

John N. Hermes, Oklahoma City, Okl. (Judson S. Woodruff and John E. Sargent, Jr., Oklahoma City, Okl., with him on the brief; McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, Okl., of counsel), for appellee, cross-appellant.

Before SETH, Chief Judge, BARRETT, Circuit Judge, and ROGERS, District Judge.*

The NAVAJO TRIBE

v.

The UNITED STATES.

The NEZ PERCE TRIBE OF IDAHO

v.

The UNITED STATES.

Nos. 69, 299, 353, 179–A.

United States Court of Claims.

Oct. 18, 1978.

---

* Of the District of Kansas, sitting by Designation.

Nichols, J., concurred and dissented with opinion.

William C. Schaab, Albuquerque, N. M., attorney of record, for plaintiff Navajo Tribe.

Frances L. Horn, Washington, D. C., for plaintiff Nez Perce Tribe of Idaho; Angelo A. Iadarola, Washington, D. C., attorney of record; Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Dean K. Dunsmore and Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant in both cases.

ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT AND DISMISSAL

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KUNZIG and BENNETT, Judges, en banc.

DAVIS, Judge:

These cases, transferred here from the Indian Claims Commission prior to its termination,[1] confront the court with the troublesome but important issue of the extent to which the Commission (and this court, on transfer) can consider injuries done to Indian entities after August 13, 1946 (the date of enactment of the Indian Claims Commission Act of 1946, 25 U.S.C. §§ 70a–70w (1976)) or having their actual impact after

---

1. Under the Act of Oct. 8, 1976, Pub.L. No. 94–465, 90 Stat. 1990, *as amended by* the Act of July 20, 1977, Pub.L. No. 95- 69, 91 Stat. 273. This legislation provides for (1) the termination of the Commission no later than September 30, 1978; (2) transfer by the Commission to this court (prior to December 31, 1976 and thereaft- er) of any cases which the former determines it cannot completely adjudicate by September 30, 1978; (3) on dissolution of the Commission, transfer of all pending undetermined cases to this court. After transfer, this court has all the powers the Commission has had under the Indian Claims Commission Act.

that day.[2] Both cases are practically the same for present purposes and may be considered together in one opinion.[3]

I.

A. *The Navajo Tribe:* The Tribe timely filed with the Commission in 1950 a petition containing a claim for a complete accounting by the Government for all income and receipts from tribal property held in trust by the Government, and of all expenditures by the Government from tribal funds.[4] Accountings were supplied by the United States (beginning in 1961) and the Indians excepted to portions. The complex details and procedural history need not be set forth because the principal issue we consider at this time is a general jurisdictional one arising in this instance from the following set of particular facts: First, the Tribe claimed that from time to time, both before and after August 13, 1946, the defendant wrongfully used various tribal funds to pay for expenses for the maintenance, administration and upkeep of federal Indian agencies which should not have been charged to the Indians (these are referred to in the record and arguments by the shorthand expression of "miscellaneous agency expenses"). The Commission held, first, that with respect to the period prior and up to August 13, 1946, the challenged disbursements were improper (and redress was within the Commission's jurisdiction), 31 Ind.Cl.Comm. 40 (1973); 34 Ind.Cl.Comm. 432 (1974);[5] second, that the Commission had authority to consider similar disburse-

ments after August 13, 1946 if they were part of a continuing wrong which began before August 13, 1946 and continued thereafter, 36 Ind.Cl.Comm. 433, 434–35 (1975); 34 Ind.Cl.Comm. 432, 434–35 (1974); 31 Ind. Cl.Comm. 40, 53 (1973); and, third, that the plaintiff had shown that payments of agency expenses from Indian funds constituted a continuing wrong initiated before August 13, 1946 and therefore that the Tribe was entitled to an up-to-date accounting of these miscellaneous agency expenses. 39 Ind.Cl.Comm. 252 (1976).

A second, parallel, dispute over accounting claims, said to begin before August 13, 1946 and continue thereafter, concerned several "Individual Indian Money" (IIM) accounts in the Treasury. The Government resisted having to account for 35 of these accounts because those particular accounts did not exist, or have any activity, prior to August 14, 1946. The Commission denied, without prejudice, requests by defendant to exclude the 35 accounts from the accounting. 36 Ind.Cl.Comm. 181 (1975); 39 Ind.Cl. Comm. 10, 32 (1976). Thus, the Commission never finally decided this question of the 35 IIM accounts.

Thereafter, by order of December 27, 1976, the consolidated accounting claims (Nos. 69, 299, and 353) were transferred to this court. 39 Ind.Cl.Comm. 261 (1976). The trial judge to whom the case was assigned then gave the Government permission to file this motion for partial summary judgment on the issue of accounting to date (rather than merely to August 13, 1946).[6]

---

**2.** The Claims Commission Act provides that no claim accruing after the enactment date (August 13, 1946) shall be considered by the Commission. 25 U.S.C. § 70a (1976). Claims accruing after that date come directly to this court under 28 U.S.C. § 1505. *See* Part II, *infra*, for fuller texts.

**3.** We postponed oral argument for some time until at least five active judges were available to hear the cases. (Judge Kashiwa is disqualified and Judge Smith was not a member of the court when the cases were argued and submitted.)

**4.** This was Indian Claims Commission Docket No. 69. Comparable, though more specific, accounting claims were stated in Dockets No.

299 and 353. The Government's accounting purported to cover all three dockets. In the course of the proceedings before the Commission, the latter two dockets were consolidated with No. 69, in order to put all of the Navajos' accounting claims into one case. *See* 31 Ind.Cl. Comm. 40, 40–42 (1973).

**5.** These decisions are not now before us.

**6.** The trial judge's order was in terms limited to the issue of the "miscellaneous agency expenses," but we consider that, if permission was needed, defendant was also granted authority to include the problem of the 35 IIM accounts.

B. *The Nez Perce Tribe of Idaho:* The Nez Perce Tribe, through the Chief Joseph Band in the State of Washington, duly filed with the Commission a general accounting claim, *Nez Perce Tribe v. United States,* No. 179 (Ind.Cl.Comm., filed July 16, 1951). The Nez Perce Tribe of Idaho intervened. Docket No. 179 was settled as to all claims or demands up through June 30, 1951. *See* 23 Ind.Cl.Comm. 39 (1970). Excepted from this settlement and severed into Docket No. 179–A were all claims for the period after June 30, 1951.[7] In Docket No. 179–A little was done before the Commission. Defendant moved to dismiss that docket for lack of jurisdiction but this was denied. 39 Ind.Cl. Comm. 127 (1976). The Tribe then moved for partial summary judgment and supplemental accounting, asking that it be given an accounting of various funds and properties for the period after June 30, 1951.[8]

Defendant requested the Commission to transfer the case to this court without calling for a reply to the Tribe's motion. This was done on December 15, 1976, and the case has been here since that time. 39 Ind.Cl.Comm. 239, 240 (1976).

Before us now is the Tribe's motion (initially made to the Commission) for partial summary judgment and supplemental accounting, as well as defendant's cross-motion for summary judgment and dismissal on the ground that this court (on transfer from the Commission) has no jurisdiction over the claims because they are said to have arisen after August 13, 1946.

---

7. Plaintiff Nez Perce Tribe of Idaho was given the right to prosecute these post-June 1951 claims. *See* 23 Ind.Cl.Comm. 39, 68–69 (1970).

8. The types of post-1951 tribal wrongs alleged by the Indians had to do with (1) use of tribal funds for defraying the cost of government functions, (2) "reverse spending" by defendant out of tribal funds, *e. g.,* payments out of interest-bearing principal when accumulated interest accounts (non-interest-bearing) could have been used instead, (3) failure to make certain non-interest-bearing funds productive, (4) management of the tribe's timber, mineral and range assets, and (5) management of plaintiff's funds not deposited in the Treasury. *See* Plaintiff's Motion for Partial Summary Judgment and Supplemental Accounting, *Nez Perce Tribe*

## II.

The statutory scaffold for this controversy over Commission jurisdiction with respect to post-August 1946 transactions or omissions is composed of three planks: (1) section 2 of the Indian Claims Commission Act of 1946, ch. 959, 60 Stat. 1050 (codified at 25 U.S.C. § 70a (1976)) states that "No claim accruing after the date of the approval of this Act [August 13, 1946] shall be considered by the Commission"; (2) section 12 of the Act, ch. 959, 60 Stat. 1052 (codified at 25 U.S.C. § 70k (1976)), declares that "The Commission shall receive claims for a period of five years after the date of the approval of this Act [August 13, 1946] and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress"; and (3) section 24 of the Act, 60 Stat. 1055 (later codified in 28 U.S.C. § 1505 (1970)), which provided in relevant part that "The jurisdiction of the Court of Claims is hereby extended to any claim against the United States accruing after the date of the approval of this Act [August 13, 1946] in favor of any Indian tribe, band, or other identifiable group of American Indians * * * arising under the Constitution, laws, treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band, or group."[9]

---

*of Idaho v. United States,* No. 179–A (Ind.Cl. Comm. Nov. 22, 1976).

9. 28 U.S.C. § 1505 (1970), based on § 24 of the Claims Commission Act, provides:

"The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

It is now more than 22 years since the first interface, in this court, between these statutory provisions and the problem of Indian wrongs said to occur after August 13, 1946 but which had their roots in the earlier period. *Gila River Pima-Maricopa Indian Community v. United States*, 140 F.Supp. 776, 135 Ct.Cl. 180 (1956). The Gila River Pima-Maricopa Indians filed suit in this court on a number of claims which were identical to claims then pending before the Indian Claims Commission except that the plaintiffs sought damages in this court only after August 13, 1946 (leaving to the Commission the damages suffered before that date).[10] The United States moved for judgment on the pleadings or for summary judgment on the grounds, among others, that the Commission had jurisdiction over the entire claims (including the post-August 1946 portion), that to permit maintenance of the action in this court would allow splitting of unitary causes of action, and that the suit here was in violation of 28 U.S.C. § 1500, which excludes jurisdiction in this court because of pendency of the claims in other courts.

In acting on the defendant's motions, the court discussed the problems at some length. Judge Littleton pointed out that our jurisdiction (under what is now 28 U.S.C. § 1505) would reflect whether the Commission had authority over "damages or compensation accruing subsequent to the passage of the Indian Claims Commission Act although the causes of action themselves may have accrued prior to that date." 140 F.Supp. at 778, 135 Ct.Cl. at 185.

The opinion did not purport to give a definitive answer,[11] but the discussion wholly favored the Commission's authority in such circumstances. The court observed that "A claim arising prior to such date [August 13, 1946] would not seem to be cut off where it is a continuing one," 140 F.Supp. at 778, 135 Ct.Cl. at 185, and that while the Indians' petition in this court was limited to damages or compensation accruing subsequent to August 13, 1946, their petition in the Commission "on the same claims does not contain such limitation and we find no such limitation in the statute." 140 F.Supp. at 779, 135 Ct.Cl. at 186.

Most significantly, the court, specifically adverting to the division of jurisdiction between the Commission and this court with respect to claims accruing before and after August 13, 1946, "illustrated" the "problems resulting from this arrangement" "as follows":

> Where a tribe is suing on a claim involving the recovery of periodic installments of compensation such as rent under a lease, and several of the installments fell due and were unpaid prior to the passage of the Indian Claims Commission Act while others fell due and were unpaid subsequent to that date, the question arises as to whether or not, on a claim therefor filed in the Commission, that body has authority to render judgment for all such installments of unpaid rent up to the date of its final judgment, or whether its jurisdiction is or should be held to be cut off and limited to rendering judgment for only those installments due prior to August 13, 1946, so that suit for the remaining installments must be brought in the Court of Claims. There is no express provision in the Indian Claims Commission Act one way or the other on this point, nor in the legislative history of

---

**10.** Among those claims was one for allegedly illegal but regular assessment of operation and maintenance charges collected by the defendant for delivery of waters of the Gila River to the Indians. That same claim, as filed in the Commission, is now before us in Appeal No. 4–76. For the other pertinent claims of the Gila River Indians in this court *see* note 13 *infra*.

**11.** The court thought it best "to refrain from passing on such issues at this time, thus leaving the Commission free to determine in the first instance the questions raised, including the scope of its own jurisdiction raised with respect to such claims subsequent to August 13, 1946." 140 F.Supp. 776, 779, 135 Ct.Cl. 180, 187 (1956). Because of this cautious approach, the court denied defendant's motion without prejudice and suspended further proceedings in this court pending the outcome of the Indians' suit before the Commission and any appeals therefrom. 140 F.Supp. at 781, 135 Ct.Cl. at 190.

the act insofar as we have been able to determine. It is the usual rule that a court once having obtained jurisdiction of the persons and subject matter of a suit, retains such jurisdiction for all purposes including the awarding of all damages accruing up to the date of judgment. This is a good rule and we find nothing that would prevent its application here. [140 F.Supp. at 779, 135 Ct.Cl. at 186.]

Six years later, after a further oral argument triggered by a rule to show cause why the suit in this court by the Gila River Pima-Maricopa Indian Community should not be dismissed, the court dismissed the suit by order, noting its conclusion "that the allegedly wrongful acts of the defendant first accrued, if at all, prior to 1946, and it is held that the Indian Claims Commission has jurisdiction to award just compensation for such acts, whether the full content thereof became apparent before or after 1946", and that "the Indian Claims Commission has jurisdiction of the controversies asserted in the petition filed in this court." [12] 157 Ct.Cl. 941–42 (1962).

 We think that the only acceptable way to read these *Gila River* decisions in 1956 and 1962 is as a holding by this court that, if a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of conduct which began prior to that time. In view of the nature of the claims discussed in 135 Ct.Cl. and dismissed in 157 Ct.Cl., that is the only permissible reading.[13] That was how this court understood and reaffirmed the holding in *United States v. Southern Ute Tribe*, 423 F.2d 346, 362–63, 191 Ct.Cl. 1, 30–31 (1970), *rev'd on other grounds*, 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971).

If we adhere to the *Gila River-Southern Ute* position, we would be required to reject the defendant's overall position in the cases now before us. That contention is, first, that each particular misuse of tribal funds or property, or failure to act properly, gives rise to a separate claim; second, that each such separate claim arising after August 13, 1946, can be vindicated only by timely suit in this court under 28 U.S.C. § 1505; and, third, that the Commission has no jurisdiction over those expenditures, incidents, or failures occurring after August 13, 1946, even though they result from a course of conduct or policy begun before that cut-off day and continuing thereafter.

### III.

Defendant does ask us to depart from our *Gila River-Southern Ute* stance; we are told that those rulings fly in the face of the statutory command and cannot be followed.

---

**12.** The order described the Indians' action before the Commission as "seeking recovery from the defendant herein for allegedly wrongful acts of the defendant which took place prior to the passage of the Indian Claims Commission Act on August 13, 1946, and are alleged to have continued thereafter," and then described the Indians' suit in this court as claiming "for all losses sustained by them since 1946 as a result of said allegedly wrongful acts." 157 Ct.Cl. 941–42 (1962).

**13.** The dismissed *Gila River* claims in this court included: (1) failure and refusal of the Government to deliver to the plaintiffs the natural flow and the stored waters of the Gila River and also for the alleged failure of the defendant to stop various non-Indian users from diverting to their uses the waters of the Gila River and its tributaries; (2) illegal assessment of operation and maintenance charges for delivery of waters of the Gila River to plaintiffs (*i. e.*, the claim in Appeal No. 4–76); (3) failure of the defendant to protect and secure the Indians in their immemorial rights to the waters of the Salt River; (4) alleged breaches by the Government in connection with the leasing of parts of the Indians' reservation lands to the War Relocation Authority during World War II; and (5) a demand for an accounting from the Government. 140 F.Supp. 776, 777–78; 135 Ct.Cl. 180, 182–84 (1956).

None of these *Gila River* claims was for a constitutional taking in which the taking wholly occurred before August 13, 1946 and part of the damages became apparent only afterwards. That is how defendant describes *Colorado River Indian Tribes v. United States*, 156 Ct.Cl. 712 (1962), in which the court, two months before the *Gila River* order, dismissed those plaintiffs' suits because the Commission had full jurisdiction.

Insisting that Congress confined the Commission's jurisdiction strictly to wrongs perpetrated on or before August 13, 1946, defendant invokes the general principles that Congress has the exclusive right to determine the jurisdiction of federal tribunals and that consents to sue the United States must be strictly construed. We have considered the matter afresh and conclude, first, that the *Gila River-Southern Ute* position is probably correct and, at the very least, tenable and supportable; and, second, that there is no strong or compelling reason to reject it at this time—rather, the opposite. In this Part III of our opinion we discuss the first of these propositions; we probe the second in Part IV.

Consider first the words of the relevant portions of the Indian Claims Commission Act. Section 2, 25 U.S.C. § 70a (1976), bars the Commission from entertaining any "claim" "accruing" after August 13, 1946. Section 12, 25 U.S.C. § 70k (1976), directs the Commission to receive "claims" for five years after August 13, 1946, and declares that no "claim" "existing"[14] before that date can be considered by any court or administrative agency, or by Congress. Section 24, now 28 U.S.C. § 1505 (1970), gave this court jurisdiction of any "claim" "accruing" after August 13, 1946. In each of these instances the words "claim" and "accruing" were left undefined in the statute. Our *Gila River* rulings took "claim" in those related contexts as broad enough to cover a challenge to a continuing and general course of conduct injurious to the Indian claimant, and not as necessarily restricted to the particular transactions or omissions, one by one. Similarly, "accrued," as

related to such a general "claim," was taken to mean the time when the course of conduct was first ripe enough for suit in the Commission even though all the damaging transactions or incidents would not themselves occur for some years.[15]

This interpretation does not cross the literal words of the statute, or any entrenched principle necessarily incorporated into the legal meaning of those terms. Rather, "claim" and "accrual" of a claim are apt candidates for Justice Holmes' aphorism in *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).[16] There is no compulsion that they be given exactly the same content here as in the "continuing claim" doctrine which has proved useful in applying this court's six-year statute of limitations to backpay and patent cases.[17] Among the considerations entering into the use of that type of "continuing claim" principle for this court's six-year limitations period are (1) the feeling that it would be somewhat unfair to plaintiffs to bar them forever—no matter how long the wrongful deprivation continued—if they did not bring suit within six years of the first administrative refusal or failure to pay the amount claimed or the enactment of the statute giving rise to the claim, and (2) the difficulty and speculation (especially in patent cases) of determining, in the beginning and all at once if suit had to be brought within the first six years, the amount of recovery for the future (a patent lasts for 17 years) as well as the past, *see Calhoun v. United States*, 354 F.2d 337, 338, 173 Ct.Cl. 893, 896 (1965). Those factors do not enter into Claims Commission cases, with statutory coverage of all claims accrued on or

---

**14.** Here the word is "existing," not "accrued."

**15.** In its opinion in 135 Ct.Cl. 180, 140 F.Supp. 776 (1956), the *Gila River* court expressly distinguished between "accrual" of the claim itself and "accrual" of the damages arising from that claim. *See* 140 F.Supp. at 778, 779, 135 Ct.Cl. at 185, 186.

**16.** "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to circumstances and the time in which it is used."

**17.** *See, e. g., Burich v. United States*, 366 F.2d 984, 986, 177 Ct.Cl. 139, 143 (1966), *cert. denied*, 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182 (1967); *Calhoun v. United States*, 354 F.2d 337, 173 Ct.Cl. 893 (1965); *Lerner v. United States*, 168 Ct.Cl. 247, 252–53 (1964); *Russell v. United States*, 314 F.2d 809, 811, 161 Ct.Cl. 183, 186 (1963); *Friedman v. United States*, 310 F.2d 381, 384–85, 159 Ct.Cl. 1, 6–8 (1962), *cert. denied sub nom. Lipp v. United States*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963).

before August 13, 1946, no matter how far back they go. Once suit is timely filed, the plaintiff is fully in court for all past damages, and there need be no difficulty or unfairness in assessing damages for wrongs of the same type continuing while the suit is pending; indeed, as the *Gila River* opinion pointed out, that is the normal rule for timely-filed proceedings. 140 F.Supp. at 779, 135 Ct.Cl. at 186; *see also Calhoun v. United States*, 354 F.2d 337, 338–40, 173 Ct.Cl. 893, 896–99 (1965).

On this view, the Commission could properly entertain, without transgressing any provision of the Claims Commission Act, a petition timely filed on or before August 13, 1951 (five years after August 13, 1946), which expressly stated as its claim, let us say, that the Federal Government had followed since 1940 the wrongful course of conduct and general policy of using tribal funds to pay for purely Indian agency governmental needs, and such a general claim would entitle the Indian claimant to redress for such wrongful expenditures not only up to August 13, 1946, but also beyond that date until judgment.[18] The clear objective of the Claims Commission Act to "clean up", once and for all, past wrongs going far back in our history (without regard to limitations or laches)—*see Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483, 487 (1966)—supports such a broad understanding of "claim" and "accrual" of a claim for Commission purposes. It is also sustained by the significant practical considerations we outline *infra*.

Refusing to accept this solution, defendant says that Congress, in the Claims Commission Act, sharply separated the Commission's jurisdiction from this court's original jurisdiction by the date of enactment (Au-gust 13, 1946), and that adherence to the canon of strict construction of waivers of sovereign immunity requires us rigidly to heed that very distinct, razor-edged, cleavage. But we have already reiterated that no insuperable obstacle, linguistic or theoretical, bars definition of a "claim," for Commission purposes, as including a continuing federal policy or course of conduct; similarly, "accruing," with respect to a "claim," can mean in this context the initiation or commencement of such a continuing policy or course of conduct (regardless of the dates of impact of the series of individual transactions or omissions which make up that "claim").

As for the canon of strict construction, we doubt that it has its full force where, as here, Congress has waived immunity, not partially (as is most often the case), but almost wholly—distinguishing only by date between the two federal tribunals selected to hear those cases as to which immunity has been set aside. Normally, a waiver is read strictly so as not to catapult courts, or particular kinds of courts, into matters or relief which Congress did not wish to repose at all in the judicial branch or in certain tribunals. *Cf. McElrath v. United States*, 102 U.S. 426, 440, 26 L.Ed. 189 (1880); *United States v. Testan*, 424 U.S. 392, 399–404, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Here, there is little reason to think that the 1946 Congress had any such aim. For the types of claims with which we deal in the present cases, there is little difference in authority between the Commission and this court acting under 28 U.S.C. § 1505.[19] Defendant admits that when it says that the Commission has jurisdiction over these wrongs consummated on or before August 13, 1946, and argues that

---

18. *Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966), recognized at 487–89, 491, that the Commission had equitable authority to compel a general up-to-date accounting. A general claim for redress of a continuous course of wrongdoing is close kin to such a general accounting.

19. This court does not have "fair and honorable dealings" jurisdiction under 28 U.S.C. § 1505, but the claims we are considering arise under other heads of jurisdiction, especially subdivisions (1) and (2) of Section 2, 25 U.S.C. § 70a (1976). Though *Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966), holds that we have no general equitable jurisdiction under § 1505 and cannot order an accounting as such that opinion also rules that this court has power, after individual wrongs have been proved to order an accounting in order to determine the proper monetary relief. 174 Ct.Cl. at 490–92.

suit should have been brought in this court for the very same type of wrongs consummated thereafter.

It is true that the Commission was to be a temporary tribunal and Congress did not expect its life to be prolonged indefinitely. But Congress also knew that it would have at least a decade of life,[20] that petitions could be filed at any time up to August 13, 1951, and therefore that post-August 1946 wrongs, connected with pre-August 1946 events, could very well occur both before and while proceedings were pending in the Commission. It is difficult to believe that Congress would *insist* that two sets of proceedings had to be carried on simultaneously, one in the Commission on pre-August 1946 wrongs and the other in this court on the very same category of injuries (stemming from the same general policy or course of conduct) which happened to be perpetrated after that time. The principles which underlie the strict construction of statutory waivers of sovereign immunity simply do not have full strength in the precise situation before us.

■■■ But even if we were to apply the principle of strict construction at full face value, we would not adopt the Government's thesis. It has never been the rule that consents-to-suit must be given the narrowest possible scope[21] or that legislation granting jurisdiction of actions against the sovereign must be read apart from history, *legislative purpose, or the dictates of commonsense. Cf. Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966). Given a fair though not expansive reading, the Claims Commission Act authorizes Commission jurisdiction over these continuing claims with roots laid prior to August 1946. Otherwise the probabilities were—even when the statute was enacted in 1946—that a substantial number of wrongs would never be redressed at all. In many instances the Indians could not file claims with any tribunal until they learned from the Government what it had done with Indian funds and property. These accountings by the defendant would necessarily take time[22] and the Indians then had to have some period in which to evaluate the materials and figures supplied to them. That is one reason why claimants were given five years in which to petition the Commission on pre-August 1946 claims. 25 U.S.C. § 70k (1976).[23] Meanwhile, of course, our six-year statute of limitations would be continuously running on claims which could be filed in this court (under defendant's theory) very shortly after August 13, 1946. The inevitable result would be that some claims, arising after August 13, 1946 under defendant's position, would be time-barred before the Indians were in any position to bring suit here, and perhaps even before they were aware of the wrongful transactions or omissions. Yet if one thing is clear it is that Congress expected all Indian claims, past and future, of those "legal" types (*i. e.*, more than purely moral) covered in the statute to have a timely day either in the Commission or in this court. There was to be no gap or hiatus for the Indian claimant. The *Gila River* interpretation makes that possible. In addition, as we have already suggested, that reading avoids concurrent litigation in two fora on the very same issues, as well as preventing the splitting of causes of action which the defendant protested when it asked the court to dismiss the protective petition which the Gila River Pima-Maricopa Indian Community had filed here as insurance

---

**20.** Section 23 of the original Act, ch. 959, 60 Stat. 1055 (1946), provided a ten-year life for the Commission if it had not finished its work earlier.

**21.** *If that were the rule, this court would not have been held competent to call on equitable concepts like reformation and rescission for help in determining monetary claims against the Government. See United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173–74, 26 S.Ct.

572, 50 L.Ed. 980 (1906); *Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966).

**22.** In fact, they took a very long period of time. The Navajo accounting was first filed in 1961. *See also* Part IV, *infra*.

**23.** There also are statutory provisions for investigations by the Commission and for calls upon the Government for information. 25 U.S.C. §§ 70*l*, 70m (1976).

against the very construction which the defendant now so urgently demands. *See also* Part IV, *infra.*

Finally, we address directly the problem—a hypothetical question in view of the way *Gila River* was decided—whether it would have run counter to the Claims Commission Act if the court had accepted jurisdiction in *Gila River.* Defendant urges that there is not a particle of concurrent jurisdiction between this court's authority under 28 U.S.C. § 1505 and the Commission's authority, and therefore that jurisdiction here over these post-1946 transactions would necessarily mean that the Commission could not consider them at all. We are not so certain of this sharp dichotomy of mutual exclusivity. Because the Commission had full-scale equitable jurisdiction, *see Klamath and Modoc Tribe v. United States,* 174 Ct.Cl. 483, 487–89, 491 (1966), it is possible in that light to construe the terms "claim" and "accruing" for Commission purposes more broadly than the same terms as used in § 1505 for this court's more limited jurisdiction; the broader construction could encompass "course-of-wrongful-conduct" or "continuing wrongful policy" claims which originated before August 14, 1946, while this court would be confined to the separate transactions or omissions actually occurring after August 13, 1946.[24] It is not unknown for a federal statute which seems on its face to declare a sharp-edged dichotomy to be read as permitting a certain amount of overlap.[25]

In any case—even if we assume that there can be no smidgen of overlap—we conclude, for the reasons already given, that defendant's position, assessed *de novo,* is not more meritorious in "pure" theory than the *Gila River* rule, and that in the area of practical operation the Government's Procrustean vise would probably prove to be inferior.

The heart of what we have been saying in this Part III is that, on reexamination, we cannot reject the *Gila River* rule as incorrect, untenable, or unsupportable. On the contrary, it seems to us appropriate, well-supported, consonant with the language and objectives of the Claims Commission Act, and sustained by practical considerations and needs.

## IV.

There are additional reasons why we consider it a mistake to overturn *Gila River* at this stage of litigation under the Claims Commission Act.

A. Chief among these is the unfairness of now departing from a substantial position which this court adopted, many years ago, at the behest of the defendant and which has been accepted since that time by

24. 28 U.S.C. § 1500 (1970) could bar a claimant from filing both a "course-of-conduct" or "continuing policy" claim in the Commission (if the claim reached beyond August 13, 1946) and a parallel post-August 1946 suit in this court on the separate "wrongs", but under the suggested analysis the claimant could use either option without running afoul of § 1500.

25. The Supreme Court faced a roughly comparable problem of division of jurisdiction—in that instance, between federal and state systems—under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1970). That statute authorized payments under it only for injuries occurring on navigable waters *and* if recovery could not validly be provided under the Constitution by state law (according to the so-called *Jensen* doctrine). It proved extraordinarily difficult to determine which particular injuries could validly be covered under state law and many workmen chose either a state or the federal route without being sure whether or not a court or tribunal would ultimately decide that the system selected by that employee could lawfully cover his injury— under the Constitution as interpreted by *Jensen* (in the case of state systems) or under the federal Act (for those choosing the federal path). Because of these great difficulties and in order to protect employees against the hazards of opting for the "wrong" path, the Supreme Court developed a "twilight zone" theory under which, if there were substantial support for choosing either route, a decision by either system would be upheld. *Davis v. Department of Labor,* 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942); *Hahn v. Ross Island Sand & Gravel Co.,* 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959); *Calbeck v. Travelers Ins. Co.,* 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). In reaching this conclusion, the Court construed the words of the Longshoremen's Act in the light of its overall aims and of practicalities.

the Indian claims community as a clear signal that the Commission had jurisdiction over these "continuing" claims and that protective actions need not be filed in this court under 28 U.S.C. § 1505.

When this court considered, in 1956, the Government's motion in *Gila River* for judgment on the pleadings or for summary judgment, the court had before it a written brief by the defendant which urged that several of the claims made in the *Gila River* court petition should be dismissed as identical to claims already on file with the Commission; the brief urged dismissal under 28 U.S.C. § 1500 and also on the ground that, because the two sets of claims were the same, the post-August 13, 1946 claims which those plaintiffs attempted to assert here split a single cause of action. In reply, the plaintiff Indians contended that the two sets of claims were separate because of the difference in the time when they arose. The court's opinion is summarized in Part II, *supra*; it obviously leaned heavily toward the position advanced by the defendant. When the court later issued in 1962 its rule to show cause why the *Gila River* petition should not be dismissed, the defendant filed no written response but it can safely be assumed that it did not oppose the dismissal which ensued.[26]

The *Gila River* decisions of the court, considered together, were obviously taken by Indian claimants and their counsel as a holding that the Commission could redress these so-called continuing wrongs both before and after August 13, 1946, and that protective suits need not be filed here. Sixteen years have passed since the dismissal order of 1962. So far as we are aware, no such protective suits in this court, similar to that of the Gila River Indians, have been brought or prosecuted since that date.[27] If we were now to reverse our direction, limitations would have run on a very large segment of the types of continuing claims we address in this opinion. Opportunity to obtain relief would thus be denied in both of the tribunals available to the Indians under the Claims Commission Act.

In addition, defendant did not conduct its proceedings before the Commission so as timely to alert the Indian claims community that it had altered its views so as to adopt a position of denial of any Commission jurisdiction over continuing wrongs perpetrated after August 13, 1946. For example, in the *Navajo Tribe* case now before us, the Government furnished a General Accounting Office report of receipts and disbursements of Indian funds going up to June 30, 1951 (almost five years after August 13, 1946); the same is true in the *Nez Perce* case, the other proceeding specifically considered in this opinion. In *Nez Perce*, too, the defendant entered into a stipulation of settlement of all claims up to June 30, 1951. We gather that it was not until the second half of the 1960's or the beginning of the 1970's that the different position, now advocated so strongly, emerged in such form as truly to warn the Indian claims bar that the United States had definitely changed its footing. By that time, of course, it was too late to sue in this court on a great many of the post-1946 incidents or transactions.[28] A separate problem was the slowness of the Government in supplying accounting reports so that claimants could adequately tell whether or not they had continuing-type claims. *See* S.Rep. No. 92–682, 92d Cong., 2d Sess. 3–5 (1972). Though the defendant need not be faulted for this delay, the re-

---

26. There is no transcript or recording of the oral argument which was had at that time. The Indians' brief written response opposed dismissal and sought a further suspension of proceedings.

27. In *Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966), the claims arose wholly out of the termination of federal supervision over the Klamath Indians which occurred in and after 1954, and had no roots prior to August 13, 1946.

28. There is no question of any deliberate entrapment. We assume that, until relatively recently, the Government did not appreciate the extent of the post-1946 accounting which would be required under the *Gila River* decisions and that the problem was more substantial than it was earlier thought to be. The length of time it has taken to complete Commission cases has, no doubt, enhanced the Government's concern.

sulting passage of time must be a factor in evaluating the propriety of overturning *Gila River* at this late date.

B. Initially the Commission, when it first addressed the matter, decided that the United States should furnish full up-to-date accountings of its management of Indian funds and property without any preliminary showing of some pre-August 1946 wrong. *See Southern Utes v. United States*, 17 Ind.Cl.Comm. 28, 63, 65 (1966), *aff'd*, 423 F.2d 346, 191 Ct.Cl. 1 (1970), *rev'd on other grounds*, 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971); *Te-Moak Bands v. United States*, 23 Ind.Cl.Comm. 70, 72 (1970); *Mescalero Apache Tribe v. United States*, 23 Ind.Cl.Comm. 181, 185–86 (1970). Somewhat later, the Commission modified its stand to comport more directly with *Gila River* and to require some showing of pre-August 1946 wrongdoing which continued thereafter. *See, e. g., Fort Peck Indians v. United States*, 28 Ind.Cl.Comm. 171, 174–75 (1972); *Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 71–76 (1973); *Fort Peck Indians v. United States*, 34 Ind.Cl.Comm. 24, 28–29 (1974), *rev'd & remanded on other grounds*, 207 Ct.Cl. 1045 (1975). Plaintiffs ask us to go beyond *Gila River* and reinstate the earlier and broader Commission view.

There is, we agree, substantial support for this theorem since a petition for an accounting from pre-August 1946 forward can, in and of itself,[29] be considered an independent claim accruing as a whole prior to August 13, 1946. *See Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483, 487–89, 491 (1966); *Blackfoot and Gros Ventre Tribes v. United States*, 32 Ind.Cl. Comm. 65, 74 (1973). However, both decisions of this court in *Gila River* rest on the narrower ground requiring a showing of a continuous course of wrongful conduct[30] and that has been the prevailing rule for several years. Indian Claims Commission

litigation is supposed to be currently on the downhill path. Just as it would be unfair to claimants to abolish the *Gila River* rule in the wholesale manner defendant suggests, so would it unfairly prejudice the defendant to broaden post-1946 coverage, at this late stage, as plaintiffs seek. We add that the straight accounting theory, though it has some appeal, is not demonstrably superior, if better at all, than the *Gila River* analysis discussed in Parts II and III, *supra*.

## V.

We come finally to the disposition of the particular cases before us.

A. In *The Navajo Tribe*, the only motion is that of the defendant for partial summary judgment; plaintiff has made no motion. The Government's motion is primarily based on its overall contention that there is no Commission jurisdiction on the basis of a "continuing wrong." For the reasons set forth in Parts II–IV, *supra*, that aspect of the motion is denied.

■ The motion also urges, alternatively, that even if there is Commission jurisdiction over "continuing wrongs," that principle does not cover the miscellaneous agency expenses or the IIM accounts involved here. On the miscellaneous agency expenses, the Commission has already decided (with one dissent) that it had jurisdiction to consider such post-August 1946 disbursements as "continuing wrongs." 39 Ind.Cl.Comm. 252 (1976). Defendant says that that decision is unsupported by any adequate showing. Since the Navajo Tribe has raised (by affidavits and documents) at least a triable issue of fact as to the existence of a continuing wrongful policy on the part of the Government to disburse Indian monies so as to defray its own expenses, the defendant's motion will be denied without prejudice as

---

**29.** *I. e.*, without any preliminary or prior proof of mismanagement or wrongdoing.

**30.** In affirming the Commission's decision on this point in *Southern Ute*, the court rested squarely on *Gila River* and held that "the Commission correctly ordered an up-to-date

accounting for continuing Government wrongdoings which predated and postdated the statutory time bar." 423 F.2d 346, 363, 191 Ct.Cl. 1, 31 (1970), *rev'd on other grounds*, 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971).

to the miscellaneous agency expenses.[31] The Commission's decision on those expenses will remain standing until a further proceeding shows that it should be vacated, overturned, or modified.

As for the IIM accounts, there has been no final Commission determination. Defendant says that several of those accounts were not in existence or had any activity before August 14, 1946, and therefore as a matter of law there can be no "continuing" jurisdiction as to those accounts. If, however, any substantial monies in those accounts were received from other accounts preexisting the cut-off date, it would seem that the *Gila River* doctrine could apply (if pre-August 1946 wrongs were shown) and defendant could be ordered to account for those accounts. There may also be other grounds for applying "continuing" jurisdiction, such as that the post-August 1946 IIM accounts were used to defray governmental expenses.[32] Defendant's motion is therefore denied without prejudice as to the IIM accounts.

█ B. *The Nez Perce Tribe* : Here, too, defendant's dominant position has been rejected and that part of its cross-motion must be denied outright. Plaintiff has moved for partial summary judgment on certain of its claims (defraying governmental expenses from tribal funds; "reverse spending"; failure to make tribal funds productive) and asks for a trial on the others. *See* note 8 *supra.* Defendant tells us, in response, that even on the *Gila River* principle there has not been a sufficient showing on the three claims for which plaintiff seeks judgment at this time. The factual presentation to the court from both sides on these specific aspects of the case has been too thin and unexplained for us to decide securely, and the appropriate course is to deny both motions without prejudice[33] and remand to the Trial Division for further proceedings. On the general question, plaintiff's motion is of course granted.

Accordingly, the motions before us are denied and granted as prescribed in this Part V of the opinion.[34] In particular, defendants' motions are denied with prejudice insofar as they assert that there can be no "continuing" wrongs occurring after August 13, 1946 over which the Commission (and this court on transfer) has jurisdiction; otherwise defendants' motions are denied without prejudice, as is the motion of the Nez Perce Tribe of Idaho asking for judgment on specified claims. On the general issue of Commission jurisdiction over "continuing" wrongs occurring after June 30, 1951, the motion of the Nez Perce Tribe is granted.

---

**31.** As already noted, plaintiff has not made any motion of its own for summary judgment and urges only that the defendant's motion be denied.

**32.** By way of perhaps unnecessary caution, we note that, for example, a wrongful course of conduct in using Indian monies to defray governmental expenses could affect various accounts or classifications and would not necessarily be limited to one particular classification, e. g., "miscellaneous agency expenses." It would be the general misuse of Indian monies for federal purposes which would be the wrongful course of conduct (whatever the particular monies used); there would not be separate wrongful courses of conduct for each tribal fund used for such ends.

**33.** Of course, as stated above we deny with prejudice the defendant's attack on the general *Gila River* doctrine. Moreover, we reject outright any suggestion that the compromise settlement of all wrongs up to June 30, 1951, makes it impossible to inquire into pre-August 13, 1946 transactions for the purpose of determining whether the Tribe is now asserting continuing post-June 1951 wrongs which had their origin and seed before August 13, 1946. The settlement, which contains a clear and explicit reservation of all claims from and after July 1, 1951, does not preclude plaintiff from raising such post-1951 wrongs.

**34.** In determining whether any post-August 1946 transaction, incident, or omission is part of a continuing course of conduct or policy antedating August 14, 1946, the Trial Division can look, of course, to the many particular decisions of the Commission on that general question, but we take no position on any of the Commission's specific results and do not, in this case, either approve or reject any of those specific holdings. We do, of course, accept the general principle of "continuing" wrongs.

NICHOLS, Judge, concurring and dissenting:

I agree to this: if the Indian tribal claimant, in a Claims Commission Act proceeding, 25 U.S.C. § 70a, establishes the wrongful invasion of any Indian account in government control, before the cut-off date of August 13, 1946, it has become entitled to a proceeding in equity in which the subsequent management of the fund must be accounted for, any diversion of the moneys into other accounts traced, and any wrongs made good, down to the date of final adjudication, whenever that may be. I base this right on the nature of an accounting as held in *Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966). The right to this "accrued" before August 13, 1946, if the first wrong preceded that date, but if it occurred later, there was no timely accrual and no jurisdiction to accord that type of relief.

What respectfully, I cannot accept, is what the opinion seems to say: that the establishment of a bad precedent, before August 13, 1946, "accrues" a claim for any wrong following that precedent that occurs thereafter. Thus, to give a concrete illustration, if the government wrongly uses Indian funds to provide an electric range for the resident agent's quarters, before the magic date, it is also liable if it wrongly uses other Indian funds to provide a copying machine for the agent's office, after that date, without regard to the identity of the accounts invaded. I suppose the nexus is that the aggrieved tribe is the same, and the defendant's claim of right is similar to the extent that the earlier diversion might be cited as a precedent for the later one. As I view the situation, the right to accounting pertains to accounts. My formulation would do better for the Indians than the court's, in some situations, worse in others. Maybe most of the time we would reach the same result. Perhaps I misunderstand what the court means in attaching the consequences it does to a "wrongful course of government conduct," but I think a lot of others will too.

I'm not convinced that this court intended in the opinion in *Gila River Pima-Maricopa Indians v. United States*, 140 F.Supp. 776, 135 Ct.Cl. 180 (1956), to announce views in conflict with mine. The problem the court addressed there was "wrongs" before August 13, 1946, with "damages" after. P. 185. The portion of the claims of that tribe that is before us now, Appeal No. 4–76, involves an alleged wrongful assessment of Indians for irrigation water they believed themselves entitled to receive without charge. I am prepared to believe that the Secretary's regulations, before August 13, 1946, denying such entitlement "accrued" all at once a claim for recovery of all moneys exacted from the Indians for water both before and after that date. This does not require the "intuitive leap" that the electric range—copying machine situation I have postulated does. I do not think any of the claims in that case did. Our decision on their War Relocation claims, 467 F.2d 1351, 199 Ct.Cl. 586 (1972), reveals no problem of wrongs after August 13, 1946.

The court in the volume 135 case quite obviously used the words "continuing claim" when it meant the opposite. The phrase, as used in the cases cited in Judge Davis' fn. 17, means a claim that does not accrue all at once. It accrues by degrees, whenever a new money payment becomes due. But the court obviously meant by "continuing claim" in the *Gila River* case one that did accrue all at once, the result obviously, of a single "wrong." This was in my view a mere verbal inadvertence that does not require overruling the decision as a precedent but it should induce hesitation in using its language beyond the facts then before the court.

An Indian claim that accrued only after August 13, 1946, may be now unenforceable in any tribunal. In general the statutory scheme under the present 28 U.S.C. § 1505 appears to be that if the claim accrued only after August 13, 1946, the tribal claimant must come under the regular jurisdictional categories of section 1491, with the single addition of claims founded on treaties. This excludes "fair and honorable dealings" claims, other moral claims, if any, and equi-

table accounting claims as held in *Klamath and Modoc Tribe, supra.* The court seems to say in dictum that this does not exclude very much, but that remains to be determined. It will be the issue, *e. g.*, in *Mitchell v. United States*, Nos. 772–71 through 775–71, now pending, and no doubt in many other cases. Congress clearly intended a difference of substance to turn on whether the claim accrued before or after August 13, 1946.

It is unfortunate if either the court or the defendant has misled Indian claimants, and undoubtedly, the distinctions that must be drawn do not impress the mind as just ones. I surmise that Congress in 1946 supposed injustices to Indians to be matters of history, so that there was no need for the future for tribes to have any different standing than other Tucker Act claimants. That we have so many allegations of wrong courses of conduct, whether "continuing claims" or not, passing to and through the deadline dates, presents an unforeseen problem, and to put it bluntly, a mess.

The Supreme Court's "snail darter" decision, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), appears, among other significant aspects, to announce an end to the practice of trying to "fix up" defective legislation by judicial decision. Absent constitutional factors not here involved, it is the duty of Congress and Congress alone to correct its own errors. Here, initial congressional misconceptions have consequences exacerbated by misunderstandings and changes in the government's position. Legislation is needed, but legislation by judges can only make a bad situation worse.

In pursuit of its laudable aims, the majority glosses entirely too lightly over the doctrine of strict construction of the consent to be sued. The truth is that the original Tucker Act, 25 Stat. 505, Act of March 3, 1887, consented to suits in respect of claims against the United States when the party would be entitled to redress, if the United States were suable, in "equity or admiralty." *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889) largely elimina-

ted this so far as equity was concerned, holding that a suit for specific performance was not consented to. Thus the cases as to reformation and recission of contracts, referred to in the court's fn. 21 merely preserved remnants of a grant of equity jurisdiction which, by the statutory language alone, was seemingly much broader. They do not prove the consent to be sued is not construed strictly. Similarly, the grant of admiralty jurisdiction went by the board in *Matson Navigation Co. v. United States*, 384 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932). This court now cites *Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966), but that case must be regarded as somewhat of a sport. Mr. Justice Harlan's dissent is in its reasoning closer to the usual approach of his Court to consent to be sued issues. *United States v. Emery*, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825 (1915), construed the original Tucker Act to allow tax refund suits, Mr. Justice Holmes saying at p. 32, 35 S.Ct. at p. 500—

> \* \* \* [It is an] inadmissible premise that the great act of justice embodied in the jurisdiction of the court of claims is to be construed strictly and read with an adverse eye. \* \* \*

But this cannot be taken as a safe guide to the law as it is today. The Congress deemed it necessary to ratify the result in what is now 28 U.S.C. § 1346, stating that the jurisdiction of district courts is "concurrent" with that of the Court of Claims. The rule disfavoring repeals by implication does not apply to repeals by implication of consents to be sued in the Court of Claims; this is the necessary conclusion from the *Matson* decision, *supra.* The Congress later ratified the result of the *Matson* decision, as set forth in the dissent in *Amell.* I stated for this court in *Denver & Rio Grande Western R.R. v. United States*, 505 F.2d 1266, 1267, 205 Ct.Cl. 597, 599 (1974), that our jurisdiction in tax refund cases depended both on sections 1346 and 1491, which surprised some critics, but was clearly correct; the "concurrent" language was necessary to save our Tucker Act tax refund jurisdiction against the rule of strict construction of the consent to be sued, associat-

ed with loose construction of repeals by implication.

The rule of strict construction is very much alive in our time, as witness *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1968); *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); and *United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), all reversing decisions of this court on consent to be sued issues. I believe a fair construction of these and earlier cases is that to be suable, a claim must (a) come within the express literal language of a statutory consent to be sued, and (b) must also come within the general congressional scheme as judicially conceived. *Hopkins'*, claim failed under the first test though it might have passed the second. To give equal rights to employees of certain non-appropriated agencies, Congress extended the Tucker Act jurisdiction, but unfortunately said it extended to contracts of such agencies. Since most of their employees, like those of other parts of the government serve by appointment and not by contract, *held*, the extension did not apply to them. The claim in *United States v. Jones, supra*, failed on the second ground though it passed the first. That is, it was an equitable claim, and Congress in the original Tucker Act said this court should have jurisdiction of equitable claims, but the court just could not conceive, after careful analysis of the whole statutory scheme, that Congress intended this court to be telling executive branch officials what to do, as it would in a specific performance decree. The court below, it may be noted a circuit court under the concurrent jurisdiction, had applied the first test but not the second.

Now, it can hardly be denied that as said above, important limitations on the consent to suit were intended with respect to Indian claims that accrued after August 13, 1946. It appears at least superficially from 28 U.S.C. § 1505 that an Indian tribe can sue on a claim accruing after that date only if it is one of the classes or categories of claims founded on a treaty or on which individual Indians and individual non-Indians can sue, *i. e.*, a claim founded on the Constitution,

etc. If the claim accrued before August 13, 1946, it was maintainable on much broader bases. 25 U.S.C. § 70a. The court hardly attempts to deny that there is that difference in the congressional intent, but it seeks to mitigate and modify the difference by holding, *e. g.*, that a claim for misuse of Indian funds to buy a copy machine after August 13, 1946, accrued before August 13, 1946, if a precedent for such misuse occurred before that date. This seems to me to invite another reversal, though I agree that an accounting, properly so called, can follow a misused account through and after August 13, 1946, to the present time. By the *Klamath* decision, *supra*, the right to an accounting is equitable, not legal, and carries through so that the court can examine the fund in the hands of the accountable custodian as of the time of trial.

The court, in effect, says it can define "claim" any way it pleases, a concept more reminiscent of *Alice in Wonderland* than of Mr. Justice Holmes. In *Grumman Aerospace Corp. v. United States*, Ct.Cl. No. 544–76 (slip op., decided June 14, 1976), the court made a decision concerning the meaning of the word "claim" that I did not entirely understand, and dissented from in part, but it seems to say a "claim" is a controversy wherein the "claimant" is either resisting or prosecuting a present demand for money. The word "claim" is certainly one of varied meanings, as pointed out in that dissent. The most used and most restrictive definition is perhaps that in *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958), "a demand for money or for some transfer of public property." In any context except that of legislation granting consent to be sued, it might well be, if the context permitted, a "claim" might include a demand for redress for a wrong not yet committed. The difficulty here is, if that is the meaning, the whole object of Congress in distinguishing between claims accrued before and after August 13, 1946, is frustrated. Our *Gila River*, vol. 135 decision, did *not* hold that a "claim" was broad enough "to cover a challenge to a continuing course of con- ·

duct injurious to the Indian claimant." This subtly transfers the unhappily chosen word "continuing" as used therein, from the claim to the course of conduct. I do not believe there is any authority for so sweeping a use of the word "claim" but I do not deny it is possible if the context permits. Does the context permit?

With regard to the meaning of "accruing after August 13, 1946," the usual rule is that a claim first accrues when all the events to fix the liability of the United States have occurred. *Empire Institute of Tailoring, Inc. v. United States*, 161 F.Supp. 409, 142 Ct.Cl. 165 (1958). Can this be said of a wrong that has not yet occurred?

Is it conceivable that Congress intended post-August 13, 1946, wrongs to come in under the broader consent of the Indian Claims Commission Act if the claimant is able to discover another wrong previous to August 13, 1946, that could be called a precedent? The court apparently thinks this is a desirable result, and no doubt it is, but it drastically modifies a carefully thought out consent to be sued. I do not think the rule of strict construction allows such a result to be achieved by attaching unprecedented meanings to words in the consent statute that are common currency among lawyers in more restricted meanings.

I was, I now realize, when I joined this court most deficient in understanding of strict construction of the consent to be sued. I have learned wisdom, not only by writing or participating in decisions that were reversed, but by my efforts towards reconstructing the history of this court. The generation of judges contemporary with the Tucker Act were most careful not to exceed the consents Congress had made, conservatively construed, of which history affords numerous examples. Most of the errors along that line, requiring reversal, were by circuit or district judges purporting to exercise their concurrent under $10,000 jurisdiction. They were presumably less aware of congressional intent in the Tucker Act. There is no more need now than then for our heads to be constantly bloodied in course of efforts to exercise jurisdiction we do not possess. Decisions to "fix up" defective legislation are particularly unfortunate when they deal with the consent to be sued. On the other hand, a corollary I think is that it is our duty to say so when we see a statute (including a consent to suit statute) as defectively drafted, rather than try to extol it as the summit of wisdom, Blackstone fashion. The court's opinion does a brilliant job along this latter line: no one can read it and not see that corrective legislation is urgently needed. We must have confidence in Congress. It is accessible to Indian claimants, and I think, if we construe the involved consent to be sued as it was written, the plaints of any Indian claimant aggrieved thereby will be heard in Congress and better legislation will ensue.