**PUEBLO OF SAN ILDEFONSO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 354.**

United States Court of Federal Claims.

June 5, 1996.

See also *New Mexico v. Aamodt*, 618 F.Supp. 993, and 6639–M Civ., (D.N.M. May 3, 1989).

Peter C. Chestnut, Albuquerque, New Mexico, attorney of record for plaintiff. Ann B. Rodgers, and Chestnut Law Offices, of counsel

Daniel G. Steele, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Lois J. Schiffer, for defendant. James M. Upton, of counsel.

## OPINION

FUTEY, Judge.

On August 11, 1951, plaintiff, Pueblo of San Ildefonso, filed several claims against defendant, the United States, before the Indian Claims Commission (ICC). On May 25, 1978, the case was transferred to the United States Court of Claims and later continued in this court. The case is currently divided into several subdockets, ranging from 354–A to 354–E. These subdockets are before the court at various stages of litigation. Subdocket A involves a claim for compensation arising from trespasses against plaintiff's water rights and is before the court on cross-motions for summary judgment. In subdocket B, plaintiff, relying on defendant's accounting reports, contends that certain expenditures of plaintiff's trust funds were improper according to the applicable statutes.

In addition, plaintiff asserts that defendant failed to account for certain collections made on behalf of plaintiff. The court held a trial on the merits of subdocket B on December 5–7, 1995. Subdocket C addresses two breach of trust claims against defendant. First, plaintiff contends that defendant had a duty to make productive the amounts due as damages from subdockets A and B. By failing to place these funds in United States Treasury Accounts, plaintiff claims defendant has breached this duty. Second, plaintiff argues that defendant breached a duty to replace land and water rights lost to settlers. Defendant moved to dismiss the claims in this subdocket, contending that no such duty existed. In response, plaintiff filed a motion for summary judgment. Subdocket D concerns defendant's failure to obtain a particular parcel of land for plaintiff's benefit, arguably breaching the duty to deal fairly and honorably with plaintiff. The parties have filed cross-motions for summary judgment.[1]

### Factual Background

A. Subdocket A: Land and Water Rights Claims

Plaintiff is one of several Indian agricultural communities located in what is now the State of New Mexico. Mexico ceded this area to the United States in 1848 under the Treaty of Guadalupe–Hidalgo, 9 Stat. 922. Congress attempted to protect the pueblos' property rights by prohibiting non-Indians from settling on pueblo land and by providing that Indians could sell their land only to the United States. Indian Trade and Intercourse Act, 4 Stat. 729; 9 Stat. 574, 587. Federal officials, however, had difficulty in protecting the pueblos' property rights because of the territorial courts in New Mexico. These courts held that Pueblo Indians were citizens of the United States, rather than wards, and therefore subject to the laws of the territory. This reasoning resulted in decisions allowing the pueblos to dispose of their lands at will. Furthermore, the Supreme Court upheld the territorial courts' reasoning in *United States v. Joseph*, 94 U.S.

---

1. Subdocket E, involving a Fifth Amendment takings claim, is currently being settled by the parties. The attorneys have agreed on the settlement amount and are awaiting approval of the settlement terms from the Deputy Assistant Attorney General. In the meantime, the parties have begun drafting the stipulation that will lead to the dismissal of this portion of the case.

614, 24 L.Ed. 295 (1876). As a result, many non-Indians occupied and acquired land within the pueblos.

In 1910, Congress halted these incursions by passing the New Mexico Enabling Act, 36 Stat. 557. This act declared lands owned and occupied by Pueblo Indians to be under the absolute control of Congress. *Id.* at 558–9. In a unanimous decision, the Supreme Court expressly overruled its prior decision in *Joseph* and upheld the constitutionality of the New Mexico Enabling Act. *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). To resolve the question of non-Indian settlers' claims to pueblo lands, Congress enacted the Pueblo Lands Act of 1924 (1924 Act).[2]

The 1924 Act, in turn, established the Pueblo Lands Board (Board). In § 6 of this act, Congress instructed the Board to issue a report on the status of the pueblo lands. Specifically, Congress charged the Board with determining the extent to which pueblo lands and water rights had been lost. In the event of such a loss, the Board was further instructed to report on whether defendant could have recovered those lands and water rights through timely prosecution. If the Board found that defendant could have done so, Congress instructed the Board to find the fair market value of the lost water rights, lost land, and any other resulting loss, in order to properly compensate the Indians.

In addressing the loss of plaintiff's lands, the Board found that plaintiff lost 863,308 acres of land that could have been regained by defendant's seasonable prosecution. The Board appraised the value of the lost lands at $52,337.15, yet paid only $24,441.05 to plaintiff.[3] Congressional hearings held in the early 1930's indicated that the amount of payment was too low due to the Board's improper departure from the appraised values. S.REP. No. 678, 72d Cong., 1st Sess. 4–5 (1932); H.R.REP. No. 123, 73d Cong. 1st Sess. 3 (1933). Therefore, in order to remedy the Board's error, Congress passed a second Pueblo Lands Act (1933 Act), 48 Stat.

108, which provided additional compensation for the pueblos. Under § 2 of the 1933 Act, Congress authorized payment of $37,058.28 to plaintiff in particular. Section 6 of the 1933 Act provides that acceptance of the compensation discharges all claims under the 1924 Act. On August 7, 1933, plaintiff accepted the money and consented, in writing, to the abandonment of further claims under the 1924 Act.

Despite this waiver, plaintiff's claim in subdocket A seeks additional compensation related to the trespasses against its land and water rights. On October 13, 1995, defendant moved for summary judgment. In response, plaintiff cross-moved for summary judgment.

## B. *Subdocket B: Accounting Claim*

The facts in this subdocket address compensation funds collected under the 1924 Act. As discussed above, the 1924 Act provided for compensation to the pueblos. Once defendant collected this compensation, defendant held these funds in trust for the pueblos, including plaintiff. The 1924 and 1933 Acts, as well as various appropriations bills, stipulated how these funds could be spent. In 1961, plaintiff requested a report from defendant accounting for collections and disbursements of these funds. In response, defendant issued a Government Accounting Office Report (GAO Report). The GAO Report indicates that defendant spent $24,255.29 of the plaintiff's funds on items other than replacement land or water rights. These items include agricultural equipment and supplies, attorney's fees, irrigation development for stock raising, livestock, debts of several of plaintiff's members, canning supplies, flood relief, line riders, food, and land surveys. In 1995, defendant compiled a supplemental accounting report (1995 Supplemental Report) which provided further documentation supporting these expenditures.

Plaintiff argues, however, that defendant has failed to properly account for certain expenses and collections. First, both the

**2.** 43 Stat. 636.

**3.** The parties stipulate that, on December 5, 1930, the United States District Court for the

District of New Mexico found that plaintiff had lost title to an additional 231.63 acres, prompting the Board to pay an additional $6,147.12.

GAO Report and the 1995 Supplemental Report are silent as to any collections made in relation to an alleged use of plaintiff's land. By 1943, defendant had begun constructing what would become the Los Alamos National Laboratory. Records from the 1950's indicate that defendant leased the nearby Tovati Campground, owned by plaintiff, to a construction company. These records also reveal that defendant allowed mining of plaintiff's sand and gravel pits. Plaintiff contends that these uses of its land are connected to the construction of the Los Alamos Laboratory (Los Alamos Project). Second, defendant's accounting reports do not mention $10,129.95 of plaintiff's funds allegedly disbursed in 1950 for Tribal Court and Police activities.

Based on these failures, plaintiff's claim in this subdocket is that defendant has breached its duty to account by improperly disbursing funds and by failing to report rents and royalties for use of plaintiff's land. Defendant asserts that it has not breached its duty to account to plaintiff and concludes that plaintiff is not entitled to recover on the merits of the facts of this subdocket.

## C. *Subdocket C: Breach of Trust Claims*

Subdocket C involves two alleged breaches of trust by defendant. The first breach concerns the trespasses to plaintiff's land and water rights addressed in subdocket A, as well as the disputed collections and expenditures of funds discussed in subdocket B. Plaintiff argues that defendant should have collected rental fees for allowing non-Indian trespassers the use of the land and water. According to plaintiff, those funds, in addition to the improper expenditures and unaccounted collections of subdocket B, constitute assets that defendant had a duty to make productive. Plaintiff concludes that defendant's failure to collect or properly deposit these funds breaches that duty. Plaintiff seeks the interest that would have accrued had defendant properly invested the assets. Defendant has moved to dismiss this claim contending that it has no such duty. Plain-

tiff, in response, has moved for summary judgment.

The second breach involves defendant's attempts to purchase replacement lands and water rights. Funds collected under the 1924 Act could be spent to replace land and water rights that had been lost to the settlers. Defendant used part of the funds collected under the 1924 Act for this purpose. Issues regarding defendant's attempted replacement of these lands arose during litigation in the case of *New Mexico v. Aamodt*. In the *Aamodt* case, the State of New Mexico brought suit under its water adjudication statutes to determine the rights of plaintiff, as well as other pueblos, to use the waters of the Nambe–Pojoaque River System. Litigation began in 1966 and is still continuing. Various courts have issued opinions during the course of litigation over the years. A 1989 decision from the United States District Court for the District of New Mexico suggests that the 1924 Act funds were not the sole source of revenue for replacing plaintiff's land and water rights. *Aamodt*, No. 6639–M Civ., slip op. at 2 (D.N.M. May 3, 1989).[4] Moreover, the district court indicated that purchasing land with commingled funds would not adequately replace the lost water rights because such a purchase would not restore plaintiff's priority rights to divert water from the river system. *Id.* A Special Master issued findings of fact in 1993 indicating the extent of such lost rights.[5] Plaintiff asserts that defendant had a duty to replace the lost lands based on the 1924 Act and defendant's overall authority to purchase land. Plaintiff further cites the language of the district court and the findings of the Special Master as demonstrating defendant's breach of this duty. Defendant has filed a motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiff, on the other hand, has moved for summary judgment.

## D. *Subdocket D: Fair and Honorable Dealings Claim*

The facts related to subdocket D involve a 31,210 acre tract of land known as the Ra-

---

4. Pl.Ex. 200.

5. Pl.Ex. 210.

mon Vigil Grant (Grant). Using funds received under the 1924 and 1933 Acts, plaintiff sought to purchase the Grant. Plaintiff was particularly interested in this tract because it once belonged to plaintiff's ancestors. Defendant rejected plaintiff's proposals to purchase the Grant directly, opting instead to purchase the Grant in trust for plaintiff using funds from the Federal Emergency Relief Administration (FERA). Defendant notified plaintiff of its plans in January of 1935. The Commissioner of Indian Affairs (Commissioner) indicated that plaintiff's use of the land ultimately depended on policies of future administrations. Nevertheless, the Commissioner foresaw that defendant would allow for plaintiff's use of the land.

By April of 1935, defendant gained title to the Grant. The Commissioner again informed plaintiff that the entire tract was purchased with the expectation that it would be assigned for plaintiff's use. The Grant, however, consisted of land that suffered from overgrazing and erosion. As a result, the Commissioner indicated that there would be some regulation of plaintiff's use of the Grant. In February of 1936, the Commissioner proposed the following uses of the Grant: (1) plaintiff would be given exclusive use of the sacred area known as the Sandia Canyon; (2) Indians and non-Indians would be permitted to cut wood; and (3) non-Indians would be allowed to graze cattle and horses. Plaintiff agreed to allow others to use the Grant.[6] Non-Indians and other government agencies, however, objected to plaintiff's use of the land. To resolve the issue of the use of the Grant, Congress authorized the formation of the Interdepartmental Rio Grande Committee (Rio Grande Committee) on January 7, 1937. On October 27, 1937, the Rio Grande Committee issued a report, recommending that jurisdiction over the Grant, except for the Sandia Canyon sacred area, should be taken from the Secretary of the Interior and transferred to the Secretary of Agriculture. The Rio Grande Committee acknowledged in the report that the Grant was purchased for Indian use, but further noted that the recommended transfer would partially extinguish plaintiff's rights in the land. The Rio Grande Committee added that any such loss of rights should be compensated with other lands.

On November 3, 1937, the Solicitor for the Department of Interior asserted that the Grant was promised to plaintiff by defendant. Furthermore, the Solicitor noted that, in diverting the Grant from its originally intended use, defendant failed to provide substitute resources. The Solicitor urged the Commissioner to compensate plaintiff for its losses. In 1941, however, an interagency agreement between the Department of the Interior and the Department of Agriculture suggested that plaintiff had no rights to the Grant except for the sacred area, whereas non-Indians had grazing rights in the rest of the Grant lands. In a 1949 act, Congress officially set aside this sacred area for plaintiff, designating the land as the San Ildefonso Sacred Area Reservation.

Both parties have filed motions for summary judgment. Plaintiff claims that defendant's failure to obtain the entire Grant for plaintiff's benefit, or at least provide alternate equivalent lands, constitutes a breach in the fair and honorable dealings, formerly codified at 25 U.S.C. § 70a, cl. 5 (1976) (omitted 1978). Defendant, on the other hand, asserts that its actions were in full compliance with the provisions of that clause.

## Discussion

### I. Subdocket A: Trespass

Plaintiff's theory of recovery under subdocket A is that adverse possession of plaintiff's land and water rights by the non-Indians occurred as a result of their trespasses, which defendant had a duty to prevent. Plaintiff now seeks damages from defendant for its breach of that duty. In its motion for

---

**6.** Defendant claims that plaintiff signed an agreement indicating consent to allow others to use the Grant. J.Stip. of Facts at ¶ 110 (Fed.Cl. Oct. 10, 1995). Defendant, however, did not present this written agreement to the court. Nevertheless, plaintiff acknowledges that it did agree to let others use parts of the Grant. Pueblo of San Ildefonso Memorandum Brief in Support of The Pueblo's Motion for Summary Judgment on Issue of Liability of United States on Claims for Dishonorable Dealings in Docket 354–D at 11 (Fed. Cl. Oct. 18, 1995); see also Pl.Resp. at 6 (Fed.Cl. Nov. 14, 1995).

summary judgment, defendant claims that the Pueblo Lands Act of 1924 provided for compensation from trespasses. Moreover, defendant asserts that in accepting the additional compensation under the 1933 Act, plaintiff waived any right to further compensation. Under plaintiff's interpretation, the 1924 Act focuses solely on compensating for the loss of plaintiff's property rights, rather than damages from trespasses suffered before that loss. As a result, plaintiff contends that nothing in the 1924 Act or 1933 Act prevents recovery of such damages and concludes that the court may grant summary judgment in its favor.

### A. *Summary Judgment*

Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). In the present case, both parties claim that the language of the 1924 Act, as well as legislative history, support judgment in their favor. Therefore, resolution of subdocket A depends on whether the court interprets the 1924 Act as allowing compensation for pre-loss trespasses. Accordingly, summary judgment is proper for this portion of the case.

### B. *The Pueblo Lands Acts*

Both parties cite portions of the 1924 Pueblo Lands Act for support. The Pueblo Lands Act of 1924 states, in pertinent part:

SEC. 6. It shall be the further duty of the board to separately report in respect of each such pueblo—

(a) The area and character of any tract or tracts of land within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico and the extent, source, and character of any water right appurtenant thereto in possession of non-Indian claimants at the time of filing such report, which are not claimed for said Indians by any report of the board.

(b) Whether or not such tract or tracts of land or such water rights could be or could have been at any time recovered for said Indians by the United States by seasonable prosecution of any right of the United States or of said Indians. Seasonable prosecution is defined to mean prosecution by the United States within the same period of time as that within which suits to recover real property could have been brought under the limitation statutes of the Territory and State of New Mexico.

(c) The fair market value of said water rights and of said tract or tracts of land (exclusive of any improvements made therein or placed thereon by non-Indian claimants) whenever the board shall determine that such tract or tracts of land or such water rights could be or could have been at any time recovered for said Indians by the United States by seasonable prosecution of any right of the United States or of said Indians, and the amount of loss, if any, suffered by said Indians through failure of the United States seasonably to prosecute any such right.

The United States shall be liable, and the board shall award compensation, to the pueblo within the exterior boundaries of whose lands such tract or tracts of land shall be situated or to which such water rights shall have been appurtenant to the extent of any loss suffered by said Indians through failure of the United States seasonably to prosecute any right of the United States or of said Indians....

Thus, under § 6(a), Congress charged the Board with determining which of plaintiff's lands had been lost to non-Indian settlers. Of those lands, the Board was to determine whether defendant could have recovered them by enforcing *any* of plaintiff's rights.[7] This section implicitly acknowledges the possibility that defendant could have enforced plaintiff's property rights against trespassers, thereby preventing adverse possession. If defendant's failure to protect *any* such right resulted in *any* loss, § 6(c) held defendant liable. This broad language encompasses the injury suffered from trespasses occurring before adverse possession. Furthermore, this section directs the Board to calculate plaintiff's damages. In addition to the fair market value of land and water rights, the Board was instructed to consider the amount of any other loss. Once again, injuries from trespasses fall within this broad category of losses. Therefore, based on the language quoted above, the court finds that the 1924 Act allowed for compensation due to trespass damages in addition to other losses.

As further support for the court's interpretation of the 1924 Act, the court notes the similarity between the 1924 Act and an act passed by Congress on June 19, 1935, which also compensated Indians for defendant's failure to protect against incursions by non-Indians. Congress designed this act to compensate the Tlingit and Haida Indians of Alaska for losses related to defendant's purchase of Alaska. Section 2 of this act delineated the types of compensation that the Indians could pursue:

> All claims of whatever nature, legal or equitable, which the said Tlingit and Haida Indians of Alaska may have, or claim to have, against the United States ... for the failure or refusal of the United States to protect their interests in lands or other tribal or community property in Alaska, and for the loss of use of the same, at the time of the purchase of the said Russian America, now Alaska, from Russia, or at any time since that date ....

49 Stat. 388. The Court of Claims interpreted this act as allowing compensation for trespass damages suffered before the Indians lost their land. *United States v. Northern Paiute Nation,* 203 Ct.Cl. 468, 490 F.2d 954, 959 (1974). The 1924 Act's compensation for plaintiff's (1) land, (2) water, or (3) any other loss resulting from defendant's failure to prosecute plaintiff's rights is analogous to the June 19, 1935, act's compensation for (1) lands, (2) other property, and (3) loss of use of the same stemming from defendant's failure to protect the interests of the Tlingit and Haida Indians. Accordingly, the 1924 Act should be similarly interpreted to allow compensation for trespasses incurred before plaintiff lost its lands to the trespassers.

Both parties cite the legislative history of the 1933 Act as support for their interpretation of the 1924 Act. As discussed above, the 1933 Act awarded compensation in addition to what the Pueblo Lands Board granted under the 1924 Act. Thus, the legislative history of the 1933 Act addresses the deficiencies in the compensation awarded under the 1924 Act. Plaintiff cites hearings held in 1931 on this subject, during which, Senator Wheeler, Chairman of the Committee on Indian Affairs, discussed with plaintiff's attorney, Mr. Hanna, what factors the Pueblo Lands Board considered in calculating damages:

> Senator WHEELER: Apparently they allowed the Indians nothing for the taking away the use of the land all this time?
> Mr. HANNA: Absolutely no element of consideration there....[8]

In addition, plaintiff cited a letter introduced during the hearings that was written by an attorney who assisted the Board. The letter, sent to Board member H.J. Hagerman, indicates that the awards under the 1924 Act should have been augmented to include the value of the use of land from the time the Indians lost such use.[9] These excerpts suggest that the Board did not award trespass damages, presumably because the 1924 Act did not cover trespass damages. Furthermore, plaintiff cites a January 6,

---

7. 43 Stat. at 638 (1924 Act § 6(b)).

8. Def.Ex. 6016 at 244.

9. *Id.* at 295.

1932, Partial Report of the Committee on Indian Affairs on the Survey of Conditions of the Indians in the United States (Partial Report).[10] This report states that the purpose of the 1925 Act was to quiet title to the pueblo lands. Given the Partial Report's emphasis on compensation for the loss of property rights, plaintiff infers that Congress, in enacting the 1924 Act, overlooked compensation for trespasses suffered before such losses.[11]

Plaintiff acknowledges, however, that some excerpts from the legislative history favor defendant's position—that the 1924 Act allowed for trespass damages. At one point in the hearings, for example, Senator Bratton questioned one of the Board members about what factors played a part in compensating plaintiff:

> Senator BRATTON: And that you added $10 per acre as the amount of loss suffered by the Indians resulting from the Government's negligence in failing seasonably to file suit?
>
> Mr. WARNER: Yes, sir. I think that is what they intended to do. They put the $10 in for good measure for anything that might have arisen under that [1924] act.[12]

This statement suggests that the Board awarded, pursuant to the 1924 Act, $10 per acre as compensation for miscellaneous damages, thereby covering trespass damages suffered before plaintiff lost its land.[13] As plaintiff points out, however, the Board member appears to have recanted this statement later in his testimony:

> Senator WHEELER: Then you did not add $10 to [the appraised value of the Indian's lost land] for loss they had suffered by reason of the failure of the Government to bring suit, did you?

Mr. WARNER: No; not in any particular case.[14]

Nevertheless, the Board member later restated his original assertion:

> Mr. SCATTERGOOD: Was that extra $10 meant to cover intangible losses?
>
> Mr. WARNER: It was meant to cover all the possible things that were referred to in the [1924] act.[15]

Thus, certain passages from the legislative history suggest that the 1924 Act did not deal with trespass damages, while other passages demonstrate that the 1924 Act permitted compensation for trespass damages. Given the conflicting and inconclusive nature of the legislative history, it is not helpful in guiding the court's interpretation of the 1924 Act.

As additional support for its position, plaintiff cites *New Mexico v. Aamodt*, 537 F.2d 1102 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977), as authority for the proposition that neither the 1924 Act nor the 1933 Act have been interpreted as allowing for trespass damages. In this particular opinion, the Tenth Circuit analyzed whether plaintiff had waived the right to divert water from the Nambe–Pojoaque River System and for the benefit of plaintiff's remaining lands. Defendant argued that plaintiff's right had been lost and compensated for under the 1924 and 1933 Acts. In interpreting the two acts, the *Aamodt* court found that the original award under the 1924 act compensated for the loss of plaintiff's land but failed to compensate for plaintiff's appurtenant water rights. According to the court, compensation under the 1933 Act was designed to correct this failure. As a result, the court concluded that neither act affected plaintiff's right to divert water to remaining lands. *Aamodt*, 537 F.2d at 1109–

---

10. Def.Ex. 6013.

11. As additional support, plaintiff cites Def.Ex. 6022 at 368 (containing an interpretation of proper expenditures under the law according to plaintiff's attorney); Def.Ex. 6023 (containing memoirs of Governor Hagerman); Def.Ex. 6028 (containing a letter to the Attorney General from George Fraser, Special Assistant to the Attorney General); Def.Ex. 6029 (containing a letter from the firm of Hanna & Wilson regarding the Board's report).

12. Def.Ex. 6016 at 249.

13. *See also Id.* at 248 (quoting Mr. Warner's statement that the extra $10 per acre awarded was designed "to take in every contingency provided for by the law").

14. *Id.* at 250.

15. *Id.*

10; *see also New Mexico v. Aamodt,* 618 F.Supp. 993, 1009 (D.N.M.1985). The Tenth Circuit, however, did not address the issue of trespass against plaintiff's land and water rights. Therefore, this court does not discern the Tenth Circuit's opinion as rejecting the possibility that trespass damages were allowed under the 1924 Act.

The court concludes that the plain language of the 1924 Act established fairly broad liability against defendant. The 1924 Act directed defendant to compensate plaintiff not only for the loss of land but for any loss suffered from defendant's failure to enforce any right of plaintiff. Concurrently, the 1924 Act authorized the Board to determine the amount of loss from such failure in addition to the fair market value of lost land and water. The 1924 Act, in establishing broad liability against defendant as well as the Board's equally broad authority to assess damages, encompasses the determination and valuation of trespass damages. This interpretation is supported by guidance from this court's predecessor. *See Paiute,* 490 F.2d 954. Moreover, the inconclusive legislative history cited by the parties does not alter the court's interpretation of the 1924 Act nor do the Tenth Circuit's statements in *Aamodt,* 537 F.2d 1102, relating to plaintiff's right to divert water to its lands. Therefore, by consenting to abandon further claims under the 1924 Act as a condition to receiving further compensation under the 1933 Act,[16] plaintiff necessarily waived its right to claim the trespass damages sought in this subdocket.

## II. *Subdocket B: Accounting Claim*

Plaintiff does not argue about the propriety of particular expenses that add up to the $24,255.29 at issue. Rather, plaintiff presents the broad argument that money in the Pueblo Compensation Fund can only be used for the acquisition of replacement land and water and for irrigation works. Thus, plaintiff concludes that, because defendant spent $24,255.29 of the funds for other purposes, it breached its fiduciary duty. Defendant argues that, for the most part, its expenditures were proper under provisions of the Pueblo Lands Act of 1924 and subsequent acts. In addition, defendant contends that some of the expenses took place after defendant's duty to plaintiff ended and concludes that it cannot be held liable for those expenses. Defendant acknowledges, however, that it cannot properly account for some expenses.

Plaintiff also asserts that defendant had been collecting rents and royalties from the use of its land from 1943 to 1952 in connection with the Los Alamos Project, yet failed to list those collections in its accounting reports. As a result, plaintiff claims that it is due $171,300.73 in lease payments and royalties accrued over the 10 year period. Defendant claims that these collections occurred only after defendant's duty to plaintiff ended and therefore cannot result in liability under an accounting claim.

### A. *Allowable Expenditures*

When a trust relationship between the government and Indians exists, the government's actions are judged according to standards established in traditional trust law doctrine. The government's standard of duty as trustee for Indians is not mere reasonableness but the highest fiduciary standards. *American Indians Residing on Maricopa–Ak Chin Reservation v. United States,* 229 Ct.Cl. 167, 667 F.2d 980, 990 (1981) (citing *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973)), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). It is well settled that a trustee such as defendant is under a duty to keep and render clear and accurate accounts with respect to administration of the trust. *Red Lake Band v. United States,* 17 Cl.Ct. 362, 373 (1989); Restatement (Second) of Trusts § 172 (1959). Clarity and accuracy require that the accounting show what gains have accrued, what losses have occurred, receipts, and expenditures. *Id.* In the present case, the circumstances surrounding the enactment and enforcement of the 1924 Act establish such a trust relationship. Defendant claims that its expenditures complied with the purposes under the 1924 Act, as well as the purposes described in later acts. At trial, defendant offered

**16.** 48 Stat. at 110–11.

testimony and documentation to support its expenses. Under plaintiff's interpretation of the 1924 Act, many expenditures were improper. Moreover, plaintiff questions the sufficiency of defendant's documentation supporting these expenses.

### 1. *Allowable Expenditures Under the Pueblo Lands Acts*

■ Section 19 of the Pueblo Lands Act addresses how the funds appropriated for Indians are to be spent:

That all sums of money which may hereafter be appropriated by the Congress of the United States for the purpose of paying in whole or in part any liability found or decreed under this Act from the United States to any pueblo or to any of the Indians of any pueblo, shall be paid over to the Bureau of Indian Affairs, which Bureau, under the direction of the Secretary of the Interior, shall use such monies at such times and in such amounts as may seem wise and proper for the purpose of the purchase of lands and water rights to replace those which have been lost to said pueblo or to said Indians, or for the purchase or construction of reservoirs, irrigation works, *or the making of other permanent improvements upon, or for the benefit of lands held by said pueblo or said Indians.*

43 Stat. 636, 642 (1924) (emphasis added). Thus, contrary to plaintiff's view, the language of the statute allows for expenses beyond replacement land and water and irrigation works. It is also noteworthy that, under the 1924 Act, the Secretary of the Interior directs the expenditure of funds. In the 1933 Act, section 1 contains the same language quoted above as to how the funds may be spent. In addition, the 1993 Act makes the Secretary's expenditures "subject to the approval of the governing authorities of each pueblo." Thus, the 1933 Act gave plaintiff greater authority over expenditure of trust funds. In 1937, Congress authorized expenditures of the funds remaining in the pueblo trusts, giving pueblos, such as plaintiff, even greater authority:

Purchase of land and water rights, and so forth, Pueblo Indians, New Mexico (tribal funds): The unexpended balances of appropriations heretofore made, from the trust funds of the several pueblos, for the purchase of land and water rights, purchase of equipment for industrial advancement and fencing, irrigating, and improving lands, are hereby continued available, for the same purposes until June 30, 1938, *and for such other purposes, except per-capita payments, as may be recommended by the governing officials of the particular pueblos involved, and be approved by the Commissioner of Indian Affairs.*

50 Stat. 571–72 (1937) (emphasis added) (hereinafter 1937 Act). Thus, while the 1924 and 1933 Acts allowed expenses for the purpose of generally benefitting the land, the 1937 Act went further in allowing expenses for other purposes, as long as plaintiff's governing officials recommended the expense and the Commissioner approved it.

As support for its interpretation of what is an allowable expenditure under the Acts, plaintiff cites the memorandum opinion and order in *Aamodt*, No. 6639–M Civ. (D.N.M. May 3, 1989).[17] In this particular opinion, the issue before the district court was whether the money that had been used to purchase replacement water rights had to be traced back to funds collected under the Pueblo Land Acts. The district court distinguished replacement land and water rights purchased under the Acts from those acquired using other methods. The distinction was important because only water rights obtained under the Pueblo Land Acts would have aboriginal priority over other water users. The district court concluded that the federal government must establish the source of revenue for any purchase of water rights. *Aamodt*, No. 6639–M Civ., slip op. at 2.

The district court's opinion contains language addressing the proper expenditures under the 1924 and 1933 Acts. After quoting from both Acts and from the legislative history in the form of a letter written by Secretary Ickes, the district court stated, "[t]he purposes for which the appropriation would be spent were quite limited and only for

---

17. Pl.Ex. 200.

acquisition of replacement land and water and necessary irrigation works.... The appropriations could not or certainly should not have been used for other projects and should have been accounted for."

The very language, however, of the 1924 and 1933 Acts quoted by this court and the district court suggest that the appropriations could be used for alternative projects, such as "other permanent improvements ... or for the benefit of lands" held by plaintiff.[18] In addition, the 1937 Act, which is not addressed by the district court, gives even greater discretion for expenditures.

Furthermore, the letter written by Secretary Ickes does not suggest an interpretation contrary to the plain language of the Acts. This letter, written to the Chairman of the Committee on Indian Affairs, addresses the impact of section 5 of the 1933 Act. In that letter, Secretary Ickes pointed out that section 5 is designed to facilitate and safeguard the purchase of land and water for the pueblos.[19] Secretary Ickes' statement does not prohibit other expenditures enumerated in the Acts. In addition, the language of section 5 itself does not disallow other expenditures. Rather, it merely delineates the Secretary's authority during the purchase process.[20]

The Special Master's report of July 30, 1993 for the *Aamodt* case also supports the interpretation that the Acts allow for expenditures for other purposes beyond land, water rights, and irrigation.[21] For example, the Special Master noted that "Congress enacted the 1924 Act for the purposes, *among others,* of quieting title of non-Pueblos to lands located within the exterior boundaries of the Pueblo grants and providing compensation to the Pueblos for losses in connection therewith."[22] Moreover, the Special Master acknowledged that the purposes of the 1924 and 1933 Acts "extend to" acquiring replacement lands.[23] Thus, the Special Master indicated that a plurality of purposes exist beyond purchasing land and water rights.

Therefore, the plain language of the Acts cited above demonstrates that defendant could properly spend the funds on more than replacement land, water rights, and irrigation works. This determination, however, does not automatically warrant judgment for defendant. Although the court does not share plaintiff's interpretation concerning the 1924 and 1933 Acts, defendant must nevertheless demonstrate that its accounting reports establish that the funds were actually collected and expended. *See Red Lake Band,* 17 Cl.Ct. at 373.

### 2. Establishing Expenditures

■ Given the scope of allowable expenditures under the Acts, defendant presented expert testimony and documentation relating to the $24,255.29 in expenditures. In doing so, defendant distinguished expenditures made before August 14, 1946, from those made afterwards. That date is important because, as a case originating before the Indian Claims Commission, judicial inquiry into this matter is limited by the Indian Claims Commission Act, which stated that "[n]o claim accruing after August 13, 1946, shall be considered." 25 U.S.C. § 70a. Nevertheless, if a wrongful course of governmental conduct began before August 14, 1946, and continued thereafter, the court may properly take account of, and award relief for, the damages suffered after the critical date resulting from the continuing wrongful conduct. *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 586 F.2d 192, 198 (1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). Plaintiff has the burden of establishing a continuing wrong. *Minnesota Chippewa Tribe v. United States,* 229 Ct.Cl. 666, 666, 1981 WL 22095 (1981).

---

**18.**  1924 Act § 19; 1933 Act § 1.

**19.**  Pl.Ex. 200 at 4.

**20.**  For example, section 5 states that the Secretary could purchase lands "without being limited to the appraised values as fixed by appraisers appointed by the Pueblo Lands Board. In addition, this section allows the Secretary to purchase options on the lands and water rights.

Moreover, this section grants the Secretary authority to purchase lands before the final patents issued for those lands. 48 Stat. 108, 110.

**21.**  Pl.Ex. 210.

**22.**  *Id.* at 179 (emphasis added).

**23.**  *Id.* at 182.

Defendant claims that, of the $24,255.29 in expenditures, $5,076.38 were spent after August 13, 1946, and concludes that it cannot be held liable under plaintiff's accounting claim. Indeed, nothing in the record before the court indicates that these expenditures are part of a continuous wrongful course of action that began before August 13, 1946. Accordingly, defendant is not liable for the $5,076.38 in expenditures made after that date.

Defendant acknowledges, however, that it cannot account for $7,673.38 of trust fund expenditures. Defendant, therefore, is liable at least for that amount. As for the remaining $11,505.53, defendant presented the testimony of Mr. Charles B. Haubenstricker in an attempt to establish that the expenditures complied with the Acts discussed above. Mr. Haubenstricker is a supervisory accountant for the Indian Trust Accounting Division, Office of Finance, General Services Administration. At trial, Mr. Haubenstricker described his investigations that ultimately led to the 1995 Supplemental Report. This report summarizes the transactions addressed in the original GAO report and provides the documents that allegedly underlie those expenditures. Mr. Haubenstricker presented over 1,500 pages of documents related to the $24,255.29 of contested expenditures.

Mr. Haubenstricker's testimony addressed the circumstances under which defendant expended the trust funds. The process began with a document signed by plaintiff's governing members requesting that defendant spend trust funds for a stated purpose. The Bureau of Indian Affairs would consider the request and, if approved, issue an "Advice of Allotment" advising plaintiff that the request had been approved. Upon spending the funds, defendant would record a voucher as evidence of the amount, date, and purpose of the expenditure. Thus, in order to establish the expenditures, defendant, through Mr. Haubenstricker, presented tribal requests and vouchers for each expense.

Because of the complexity of the expenditures, Mr. Haubenstricker's testimony is crucial in guiding the court through the more than 1,500 pages of documents used to support the expenditures. Some of the expenditures that Mr. Haubenstricker claims to be adequately supported, do not satisfy his own standards. Several statements made during trial indicated that plaintiff would request funds before defendant issued a voucher.[24] Defendant, however, attempts to support several expenditures with requests made *after* defendant had already issued a voucher. For example, in support of a $6.30 expenditure for wheat, defendant cites a voucher prepared on April 6, 1943.[25] Defendant claims that this is a portion of the $1,000 requested as part of a continuing farm program.[26] Unfortunately, that request was not made until July of 1944.[27]

Additionally, the court notes that defendant has not demonstrated a precise correspondence between the amount requested by plaintiff, the amount in the voucher, and the amount at issue in any particular expenditure. For example, defendant spent $137.88 on seeds in 1948.[28] While the voucher reflects this amount,[29] the relevant request is for $1,000.[30] Most of the expenditures, however, are not supported by a voucher for the precise amount in controversy. Moreover, none of the expenditures are supported by a request for the same amount. For instance, one of the contested expenditures involves $724.76 used to purchase agricultural equip-

---

**24.** Tr. 99–100, 198. Mr. Haubenstricker's testimony was further supported by defendant's other witness, Mr. William A. Morgan during testimony about the policy underlying the Pueblo Lands Acts. Tr. 56–57.

**25.** Tr. 110–12; Def.Ex. 7018 at 516.

**26.** Def.Ex. 7003 at Tab O(a).

**27.** Defendant also purported to use this July 10, 1944, request for $1,000 as the basis for the $145.28 expenditure for seeds and clearing land.

The various supporting vouchers, however, were prepared no later than June 1944. Tr. 147; Def.Ex. 7035.

**28.** Tr. 112–13.

**29.** Def.Ex. 7020 at 622.

**30.** Def.Ex. 7003 at Tab O(a). Defendant also cites this request to support, in whole or in part, expenditures of $416.71 for seeds, Tr. 145; $145.28 for seeds and land improvement, Tr. 147; and $1855.55 for wagons, Tr. 149.

ment in 1944.[31] In demonstrating plaintiff's request for this expenditure, Mr. Haubenstricker cited a series of documents, including a written request signed by plaintiff's representatives.[32] This request, dated May 23, 1941, requests an allotment of $9,300 for agricultural equipment. As proof of the expenditure, Mr. Haubenstricker presented two vouchers totaling $740.63.[33] Thus, for an expenditure of $724.26, defendant relies on multiple vouchers and on a request dated years earlier, all of which involve greater amounts than the particular expenditure.

Furthermore, in one case, defendant simply has not provided sufficient support for the entire expenditure. In 1937, defendant spent $154.40 in attorney's fees.[34] Mr. Haubenstricker claimed that he could find vouchers supporting only $115.90. The vouchers cited by him, however, support only $78 dollars of the expenditure.[35] The request for funds also demonstrates a lack of correspondence.[36]

In attempting to explain the time lag and the differences in amounts between what plaintiff requested and what defendant paid, Mr. Haubenstricker indicated that oftentimes plaintiff would request one large lump sum that was not entirely granted at first. Rather, he noted, defendant would approve a series of smaller amounts over time, perhaps as part of a particular improvement program. Assuming this was true, it would seem logical that the series of smaller vouchers would nevertheless refer to the same original request. This is not the case, however, with some of the expenditures. In one expense involving the purchase of saddles, defendant

cites a document indicating that defendant had approved plaintiff's request by issuing Advice of Allotment No. 2666.[37] The relevant voucher cited by defendant refers to a different Advice of Allotment—number 647.[38] Both plaintiff and the court questioned Mr. Haubenstricker regarding this discrepancy. Mr. Haubenstricker responded that the original approval, as signified by a particular Advice of Allotment, must have expired over time and that "somewhere along the line [defendant] came up with another number." [39] He admitted, however, that he was merely assuming this was the case because the expenses fell under the broad scope of the chosen request.[40] His assumption apparently has no basis in fact, as he later acknowledged that he did not know how the agency or regional offices handled Advice of Allotment proceedings.[41] Further, Mr. Haubenstricker could find no bookkeeping evidence indicating the these offices ever changed Advice of Allotment numbers after granting plaintiff's requests.[42]

While the lack of precise correspondence between the expenses and the supporting documents may not necessarily defeat a trustee's accounting, the discrepancies in testimony presented to the court cast doubt on defendant's efforts in this case. As a result, the court finds that the connection between the contested expenses and the supporting documents is tenuous at best and does not meet the high fiduciary standards that the court must apply in considering defendant's duty to clearly and accurately account for expenditures.[43] Therefore, of the $24,255.29

31. Tr. 116–18.

32. Def.Ex. 7003 at Tab M–8.

33. Def.Ex. 7019 at 539, 542. The first voucher, drafted on April 10, 1944, was for $148.71. The second voucher, dated June 10, 1944, was for $591.92.

34. Tr. 150–51.

35. Mr. Haubenstricker only cited a voucher for $38.60, Def.Ex. 7028 at 804, and a voucher for $39.40, Def.Ex. 7028 at 813–15.

36. Defendant cited a request made in 1933 for attorney's fees in the amount of $3,705.82. Tr. 150; Def.Ex. 7003 at Tab C.

37. Def.Ex. 7003 at Tab M.

38. Def.Ex. 7020 at 554.

39. Tr. at 124.

40. Id.

41. Id. at 213.

42. Id. at 214.

43. Plaintiff stipulated to the presence of the request and vouchers allegedly supporting three expenditures, thereby saving the time needed for defendant to address those documents. Tr. 155, 157. There is nothing in the record before the

at issue in this subdocket, defendant is liable for all but the $5,076.38 spent after the jurisdictional deadline, for a total of $19,178.91.

### B. *Failure to Collect*

In addition to claiming improper expenditures, plaintiff also argues that defendant failed to collect certain funds. At trial, plaintiff presented the testimony of Mr. Paul J. Gillis, who has been a certified public accountant for almost 40 years. Mr. Gillis has previously provided accounting services for closely held corporations and non-profit organizations. Furthermore, Mr. Gillis has reviewed defendant's accounting reports for other tribes.

In reviewing defendant's accounting of plaintiff's funds, Mr. Gillis noted that the GAO Report, as well as the 1995 Supplemental Report, only accounted for funds deposited in the United States Treasury. Based on his experience with other tribes' accounting reports, Mr. Gillis knew that, as a practice in handling Indian trusts, agents of the Department of Interior would sometimes hold funds in local special accounts rather than in the Treasury. Mr. Gillis cited a 1952 Report to the House of Representatives (House Report) indicating that defendant did just that with a portion of plaintiff's funds.[44]

The House Report addresses income producing assets belonging to plaintiff. It specifically mentions a 30 acre plot of land known as the Tovati campsite located near the Los Alamos laboratory. In connection with a lease of this land to a construction company, the House Report stated that defendant collected $14,027.72 during fiscal year 1951 and placed these funds in a special deposit account of the Indian Service Special Disbursing Agent.[45] The House Report further indicated that $74,445.47 of plaintiff's funds resided in such special accounts at the time.[46] The House Report also states that defendant collected $10,546.90 in royalties for the mining of sand and gravel during fiscal year 1952.[47]

Given the lease and royalty activities of the Tovati campsite in connection with the Los Alamos Project, Mr. Gillis suspected that similar activity had been occurring since fiscal year 1943, when the Los Alamos Project began.[48] To resolve this question, Mr. Gillis searched for the accounting records relating to plaintiff's funds. Although Mr. Gillis could not find leases or royalty agreements, he did uncover a partial set of records from agents who handled collections for plaintiff at the local level. For example, Mr. Gillis produced a journal voucher from agent Hagberg showing the transfer of various collections from one ledger to another.[49] The collections listed in this journal represent deposits submitted in lieu of bonds for various contracts. Thus, according to Mr. Gillis, the deposits imply the existence of contracts which, in turn, suggest that defendant collected funds pursuant to those contracts. One particular deposit for $25, submitted on November 28, 1945, relates to a contract for the removal of volcanic rock from plaintiff's lands. This deposit, however, is the only record of a contract existing before the August 13, 1946, cutoff date for accounting claims.

Mr. Gillis cited similar activities after this date. For example, the same journal voucher reveals a $100 deposit paid on September 12, 1946, regarding a contract for the removal of pumice from plaintiff's land.[50] Mr. Gillis also cited agent Hagberg's records of deposits in accounts held for individual Indians which demonstrate further relevant collections from contractors in 1947. One such statement indicates that two individuals deposited funds for permits to remove sand

court to suggest that these documents were any more supportive than the documents for other expenses, especially given the discrepancies in defendant's expert testimony.

44. Pl.Ex. 216 at 27–31.

45. *Id.* at 30.

46. *Id.* at 28.

47. *Id.* at 29.

48. Fiscal year 1943 ran from July 1, 1942, through June 30, 1943. Tr. at 300.

49. *Id.* at 32.

50. *Id.*

and gravel from plaintiff's land.[51] Another statement shows a deposit paid in connection with a business lease on plaintiff's land.[52] This statement also records deposits for a trailer park permit on plaintiff's land as well as additional permits to remove plaintiff's sand, gravel, and concrete aggregate. Furthermore, Mr. Gillis produced a schedule of collection along with two office receipts demonstrating that, in 1949, agent Hagberg deposited plaintiff's funds in a special account with a bank other than the United States Treasury, probably a federal reserve bank.[53] Finally, Mr. Gillis produced ledger cards from one of agent Hagberg's accounts that reflect the collections made for plaintiff, and perhaps other pueblos, during 1949 for bonds and revenues from contracts.[54]

Mr. Gillis attempted to find documents demonstrating earlier activity, but he reached an impasse due to inadequate record keeping of files maintained at the local level.[55] Nevertheless, because (1) development of the Los Alamos National Lab began in 1943; (2) the Lab was near plaintiff's Tovati campsite; (3) the main road to Los Alamos goes through plaintiff's lands; and (4) no other project was being conducted nearby, Mr. Gillis concluded that plaintiff's land had been leased and that plaintiff's sand and gravel had been sold in connection with the Los Alamos Project. Furthermore, Mr. Gillis reasoned that defendant had been collecting rents and royalties on behalf of plaintiff from the beginning of the Los Alamos Project in fiscal year 1943 through fiscal year 1952, the year addressed in the House Report. Most of these collections, however, did not appear in the accounting reports.

In calculating the total damages over that span of time, Mr. Gillis began by estimating the damages in a given year. Using the figures from the House Report, which offered the only examples of a full year's collections, Mr. Gillis assumed yearly collections of $14,027.72 for the rental of the Tovati campsite and $10,546.90 in royalties for sand and gravel. Mr. Gillis multiplied the yearly total of $24,574.62 by 10 to arrive at an estimate of $245,746.25 in collections over the 10 year period from 1943 to 1952. From this result, Mr. Gillis deducted the $74,445.47 balance on hand in 1952, as reflected in the House Report to arrive at $171,300.73 unaccounted for by the GAO Report and the 1995 Supplemental Report.

Defendant argues that it searched for funds outside of the Treasury but could find none. In addition, defendant asserts that plaintiff failed to establish the continuing wrong needed to recover damages suffered after August 13, 1946. Plaintiff acknowledges that various leases and royalty agreements may not have been executed until after the cutoff date. Nevertheless, Plaintiff contends that Mr. Gillis' testimony demonstrated an unbroken chain of transactions that support granting damages throughout the period ranging from the beginning of fiscal year 1943 to the end of fiscal year 1952.

■ As trustee for plaintiff, defendant must account for all Indian money within its control, which includes tribal funds held by its officers and agents outside of the United States Treasury. *Maricopa–Ak Chin*, 667 F.2d at 1002–03. Defendant's expert, Mr. Haubenstricker, searched through agents' accounts and could find no evidence of collections at the local level before August 13, 1946.[56] Mr. Haubenstricker acknowledges, however, that he found a record of the $25 deposit, made nine months before the critical date, for the contract concerning the removal of volcanic rock from plaintiff's lands.[57] Based on the credible testimony of plaintiff's expert, Mr. Gillis, the court finds that a contract resulted from this deposit and was formed before August 13, 1946. Mr. Gillis testimony, supported by documentation, also suggests a continuing program of leasing and mining activities in connection with the Los Alamos Project. Therefore, defendant's fail-

---

51. Pl.Ex. 216 at 33.

52. *Id.* at 34–35.

53. *Id.* at 36–38; Tr. 294–95.

54. Pl.Ex. 216 at 39–41; Tr. 296–98.

55. Tr. 359–61.

56. Tr. 177.

57. Tr. 178; *See also* Pl.Ex. 216 at 32.

ure to account for collections related to this activity was a breach of its duty to account. This wrongful conduct began before the August 13, 1946, critical date and continued throughout the development of the Los Alamos Project, up to June 30, 1952, the end of that fiscal year. Therefore, defendant is liable for a breach in its duty to account, including damages suffered after August 13, 1946, as part of continuing wrongful conduct. *See Navajo,* 586 F.2d at 198.

As for the extent of damages, plaintiff claims that damages should be calculated as of the beginning of the Los Alamos Project in 1943. It is significant, however, that neither party could find any documentation suggesting collections before November 28, 1945. Accordingly, the court finds that plaintiff met its burden of establishing a continuing wrong only as far back as that date and extending to June 30, 1952. Thus, rather than the 10 years of damages claimed by plaintiff, the court shall award a fraction of that amount, representing six years and seven months of damages, for a total of $112,772.98.

### C. *Law and Order Expenses*

In addition to the allegedly improper expenditures discussed in part II(A) (subdocket B), plaintiff asserts that defendant improperly spent $10,129.95 on law enforcement and tribal courts in 1950. Plaintiff's expert, Mr. Gillis, assumed that these expenditures had been occurring since the beginning of the Los Alamos Project in 1943 and concluded that the 1950 expense was part of a continuing wrong. The court, however, finds it significant that neither party could find disbursements related to law and order activities before August 13, 1946. Moreover, plaintiff has not sufficiently established how these expenditures were related to the Los Alamos Project. As a result, plaintiff has not established any wrongful conduct regarding law and order expenditures that continued from a time before August 13, 1946. There-

fore, defendant is not liable for those expenditures under plaintiff's accounting claim. 25 U.S.C. § 70a; *Navajo,* 586 F.2d at 198.

Therefore, although the purposes for which defendant made expenditures are allowable under the 1924 Act, the 1933 Act, and subsequent appropriations, defendant is nevertheless liable for $19,178.91 due to its failure to properly substantiate these expenses with underlying documents. In addition, defendant is liable for $112,772.98 due to its failure to account for the rental of plaintiff's land and the royalties from plaintiff's sand and gravel. Thus, the total amount of liability in subdocket B is $131,951.89.[58]

### III. *Subdocket C: Breaches of Trust*

In terms of the breach of the duty to make assets productive, defendant moves to dismiss based on both RCFC 12(b)(1), for lack of subject matter jurisdiction, and RCFC 12(b)(4), for failure to state a claim upon which relief can be granted. As far as the breach of the duty to replace water rights, defendant once again moves to dismiss under RCFC 12(b)(4). Plaintiff, in response, has moved for summary judgment on both claims. Both parties emphasize, however, that plaintiff is seeking summary judgment only on the issue of liability. If need be, the extent of damages will be addressed in further proceedings.

### A. *Duty to Make Assets Productive*

Part of the assets in this claim include the allegedly improper expenditures of plaintiff's funds under the 1924 Act. Defendant acknowledges liability under this subdocket C claim for any compensation fund disbursements found to be improper by the court in subdocket B. The court determines that defendant is liable under subdocket B for $19,178.91 for improper accounting of expenditures. Accordingly, defendant is also liable for the additional funds that would

---

**58.** Plaintiff's damage calculation also included 4% per year in simple interest for 44 years. The issue of statutory interest on amounts due for defendant's breach of its duty to account serve as a basis for the claims in subdocket C. Pl.Resp.

to Mot. to Dismiss Lost Water Rights Claim and Lost Investment Yield Claim at 35 n. 14 (Fed.Cl. Sept. 8, 1995). Accordingly, the court will address that issue below.

have been generated by making those assets productive.

The remaining assets of this claim are composed of: (1) the rents and royalties in subdocket B that plaintiff argued were collected but not accounted for by defendant, and (2) rental fees from subdocket A that supposedly should have been collected from the non-Indians as they trespassed upon plaintiff's land and water rights. Defendant, in addressing the rents and royalties issue, argues that plaintiff has no evidence of collections before the August 13, 1946 jurisdictional deadline. Defendant concludes that this denies the court's subject matter jurisdiction over matters involving the interest due on those amounts. Plaintiff argues that it has established the court's jurisdiction with the evidence presented to the court.

### 1. *Subject Matter Jurisdiction*

In ruling on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. *Scheuer v. Rhodes* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). If the undisputed facts reveal any possible basis on which the non-moving party might prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir.1991). Plaintiff bears the burden of establishing subject matter jurisdiction. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Rocovich,* 933 F.2d at 993.

Contrary to defendant's assertion, the court found in subdocket B that collections related to the Los Alamos Project began on November 28, 1945, over eight months before the jurisdictional cutoff date. Moreover, credible testimony from plaintiff's expert established that these collections had continued through fiscal year 1952 as part of the progression of the Los Alamos Project. Because defendant failed to account for these collections, the court found a continuing wrong that began before the jurisdictional deadline of August 13, 1946, and thereby gave the court jurisdiction over this entire claim. *See Navajo,* 586 F.2d at 198. As a result, the court has jurisdiction to determine whether defendant had a duty to make those funds productive.

### 2. *Failure to State a Claim*

Even if defendant is liable for failure to collect rents and royalties, defendant nevertheless asserts that it had no duty to make those assets productive. Referring to the interest claimed on the trespasser rental fees of subdocket A, defendant maintains that it had no duty to collect those rental fees in the first place. Therefore defendant claims that it cannot be held liable for interest based on the rental fees. Plaintiff, however, contends that defendant's role as a trustee, combined with various statutory directives, impart a duty to make all of these trust assets productive.

The court will dismiss plaintiff's case for failure to state a claim upon which relief may be granted only if it appears beyond a doubt that plaintiff has not alleged facts sufficient to support its claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir. 1992). In ruling on a motion to dismiss under RCFC 12(b)(4), the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). Furthermore, all that is required to withstand a motion to dismiss is " 'a short and plain statement of the claim' that will give the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests." *Gould,* 935 F.2d at 1276

(citing *Conley*, 355 U.S. at 47, 78 S.Ct. at 102–03 (footnote omitted)).

The issue of plaintiff's right to recover interest based on a breach of defendant's fiduciary duty arose in the case of *Short v. United States*, 50 F.3d 994 (Fed.Cir.1995). Litigation in the *Short* case concerned improper distributions of funds held in trust for the Hoopa Valley Tribe of Indians (the Tribe). Defendant claimed, as it does in the case before this court, that no statute obligates defendant to pay interest. The court disagreed, citing several statutes that required interest to be paid on Indian funds. One particular statute, also cited by the plaintiff in the case before this court, is 25 U.S.C. § 162a, which allows for Indian funds to be deposited outside of the United States Treasury in order to accrue a higher rate of interest.[59] Furthermore, the Federal Circuit recognized that other statutes and regulations had established the comprehensive responsibilities of defendant in relation to the Tribe's funds. As a result, the Federal Circuit found that defendant had a fiduciary duty to the Tribe, which was breached by mismanaging the funds. *Short*, 50 F.3d at 998. Given that breach, the Federal Circuit analyzed the appropriate measure of damages. In addition to the principal funds that defendant mismanaged, the court found that the Tribe would be entitled to the interest that would have accrued as required by statute. *Id.* at 999.

■ The *Short* case provides no support for plaintiff's claim for interest on the rental fees from trespassers. The court's analysis of subdocket A demonstrates that the 1924 Act allowed for the recovery of trespass damages. Thus, at best, plaintiff received these assets long ago as part of the Board's original award or as part of additional compensa-

tion. At the least, plaintiff had a right to those assets but waived that right upon receiving compensation pursuant to § 6 of the 1933 Act. Either way, plaintiff has no currently viable claim to those assets and defendant therefore cannot be held liable for failing to invest them. Thus, to the extent plaintiff seeks interest from rental fees that should have been collected from trespassers, plaintiff has failed to meet its burden under RCFC 12(b)(4).

■ The facts in the *Short* case, however, are analogous to the facts concerning plaintiff's claim for interest from leases and royalties collected as part of the Los Alamos Project. In subdocket B, the court pointed out circumstances such as defendant's sovereignty over plaintiff; defendant's control over plaintiff's land; and defendant's management of the proceeds collected due to the loss of that land. These events demonstrate defendant's general fiduciary duties to plaintiff. These duties include the duty to account for the collection of funds, which the court found defendant has breached in part.[60] Given this mismanagement of funds, the statutory requirement to accrue interest found in 25 U.S.C. § 162a makes defendant liable for the interest that would have accrued from these funds had they been properly managed. *Short*, 50 F.3d at 1000.

Defendant raises two arguments against applying the reasoning of the *Short* decision.[61] First, defendant claims that the funds actually did earn 4% annual interest. The deficiencies in defendant's accounting report in subdocket B, however, demonstrate that plaintiff received neither the interest nor the principal funds. As its second argument, defendant once again asserts that the principal assets were collected only after the August 13, 1946, jurisdictional deadline. The

---

**59.** Section 162a states in pertinent part:

The Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates that can be procured from the banks. The said Secretary is also

authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the funds held in trust by the United States for the benefit of individual Indians....

**60.** *Supra*, part II(B).

**61.** Def.Resp. to Pl.Motions for Summ.J. at 14 n. 7 (Fed.Cl. Nov. 13, 1995).

court, however, refuted this argument in denying defendant's motion to dismiss for lack of subject matter jurisdiction.[62] Therefore, to the extent that plaintiff seeks interest from leases and royalties collected as part of the Los Alamos project, plaintiff has a claim upon which the court could grant relief.

### 3. Summary Judgment

Plaintiff claims that it has established the lack of genuine factual issues and the appropriate legal standards which defendant has failed to rebut. Plaintiff concludes that it is entitled to summary judgment. Defendant maintains that its arguments for dismissal warrant denying summary judgment.

Any dispute over the facts in this subdocket have been addressed by the court in its analysis in subdockets A and B. Moreover, the court has also addressed the relevant legal matters. For example, the court determined in subdocket B that defendant failed to account for rentals of plaintiff's land and royalties from mining plaintiff's gravel in connection with the Los Alamos Project. Further, the court found that this wrongful conduct began before the relevant jurisdictional deadline and continued as the Los Alamos Project developed, thereby giving the court jurisdiction over the entire claim. In part III(A)(2) of this subdocket, the court decided that this breach of fiduciary duty, combined with the statutory duty to invest the funds, entitle plaintiff to interest on that amount. Accordingly, the court may grant summary judgment on the issue of liability for this part of plaintiff's breach of duty claim. This is in addition to the liability for misspent funds admitted by defendant. As stated above, however, plaintiff has failed to allege facts sufficient to support a claim for interest from rental fees that should have been collected from trespassers. Therefore, plaintiff is not entitled to summary judgment on that claim.

### B. Duty to Replace Water Rights

Plaintiff argues that defendant had a duty to purchase replacement land and water rights lost to settlers, as established by the 1924 Act as well as defendant's overall authority over plaintiff. Plaintiff further notes that the district court's May 3, 1989, memorandum opinion in *Aamodt,* in addition to the Special Master's findings in 1993, indicate that defendant did not fully replace those water rights. Therefore, plaintiff concludes that defendant breached its duty to replace plaintiff's water rights. Moreover, plaintiff claims that it is entitled to the value of the lost water rights as calculated using values from 1989—the year of the district court's opinion. Defendant moves to dismiss, claiming that plaintiff has failed to state a claim upon which relief could be granted. Plaintiff, in response, asserts that it is entitled to summary judgment in its favor.

### 1. Failure to State a Claim

Defendant argues that the court cannot grant relief on plaintiff's lost water rights claim for two reasons. First, defendant asserts that plaintiff cannot use 1989 values for determining damages; rather, plaintiff must establish the pre–1946 values of these rights. Because plaintiff has failed to offer testimony on the earlier values, defendant concludes that plaintiff has failed to establish any injury. While plaintiff claims that it did not discover the "nature of the injury" until 1989, when the district court rendered its memorandum opinion, plaintiff nevertheless states that it has produced exhibits supporting values of the water rights over a wide range of years.

Defendant's second reason for dismissal echoes its arguments in subdocket B: although replacing land and water rights was one purpose for which defendant could spend funds under the 1924 Act, defendant had discretion to spend the funds for other purposes as well. Thus, because defendant had no duty to spend funds *solely* to replace land and water rights, defendant concludes that it cannot be liable for failing to completely replace the water rights. Furthermore, even if defendant did fail in its duty, defendant claims that plaintiff waived its right to sue when it accepted additional compensation under the 1933 Act. Plaintiff argues that defendant had such a duty under the 1924 Act. Moreover, plaintiff adds that the 1933 Act

---

**62.** *Supra,* part III(A)(1).

expressly preserved plaintiff's ability to enforce this right.

▇▇▇ Regarding plaintiff's use of 1989 values, the court notes that damages sought under the Indian Claims Commission Act are generally valued at the time of defendant's breach of duty. *Nooksack Tribe of Indians v. United States,* 162 Ct.Cl. 712, 718, 1963 WL 8487 (1963), *cert. denied,* 375 U.S. 993, 84 S.Ct. 633, 11 L.Ed.2d 479 (1964); *Paiute,* 9 Cl.Ct. at 642 (indicating that the Indian Claims Commission never measured past damages at future dates). Furthermore, plaintiff's assertion that it did not discover the breach until 1989 suggests that this ICC claim did not accrue until well after the August 14, 1946, jurisdictional deadline. 25 U.S.C. § 70a. The fact that plaintiff knew enough to file this claim more than forty years ago suggests that plaintiff was aware of the nature of the breach at that time. Thus assuming plaintiff could successfully establish liability, plaintiff would be entitled to damages as valued at the time of breach. While plaintiff apparently has not submitted expert testimony as to the value at that time, defendant does not dispute that plaintiff has produced exhibits that establish such value. The court will consider that evidence when and if the issue of damages is before the court. Accordingly, the court finds that plaintiff has alleged facts sufficient to support its claim.

As for the duties established by the 1924 Act, the court has already interpreted that act as allowing expenditures for a series of purposes. In addition to purchases of replacement land and water rights, § 19 authorizes expenditures for the purchase or construction of reservoirs, irrigation works, or other permanent improvements, or the general benefit of the lands held by plaintiff. These duties are restated in § 1 of the 1933 Act and in the 1937 Act. The acts do not require defendant to spend all of the funds on replacing land and water rights; rather, defendant had a limited choice of additional expenditures. It is undisputed, however, that defendant chose to spend at least some of the funds on replacement land and water

rights. In doing so, defendant undertook a duty to fulfill that purpose: to replace the land and water rights.

In addressing the purchase of land and water rights, Congress' use of the term "replace" in the 1924 Act indicates that the newly purchased land and water should grant the same rights and benefits as did the lost land and water. Various opinions in the *Aamodt* case provide guidance as to whether the land and water purchased by defendant replaced plaintiff's water rights. In its September 18, 1985, opinion, the district court noted that, in addition to plaintiff's original rights to land and the appurtenant water, plaintiff had a right to divert water from the Nambe–Pojoaque River System and use that water to benefit the land. *Aamodt,* 618 F.Supp. 993, 1009–10 (D.N.M.1985). Moreover, the district court indicated that this right to divert had priority over the rights of neighboring non-Indians.

The district court addressed the issue of whether the newly purchased lands enjoyed the same priority in its opinion dated May 3, 1989.[63] This court addressed that opinion in part II(A) (subdocket B) and distinguished it from the current case for purposes of deciding plaintiff's accounting claim. The court, however, finds the district court opinion to be directly on point regarding the issue in this subdocket. The district court identified replacement lands as those purchased entirely by 1924 Act funds and indicated that those lands would carry the priority rights to divert water. The court distinguished these lands from mere "acquired lands" which were obtained in whole or part with other funds. The district court indicated that plaintiff's old priority rights did not attach to these acquired lands. The district court ordered a Special Master to determine the source of funds used to purchase the lands and determine the water rights accordingly. The Special Master issued his findings in 1993, indicating that some of the lands purchased by defendant could not be wholly traced to 1924 Act funds.[64]

---

**63.** Pl.Ex. 200.

**64.** Pl.Ex. 210 at 209.

Thus, based on the 1924 Act and defendant's conduct pursuant to that Act, the court finds that defendant undertook a duty to replace plaintiff's lost water rights. Further, the district court's analysis combined with the Special Master's findings suggest that defendant, in attempting to replace plaintiff's land and water rights, failed to restore the priority diversion rights that should have attached to that land. As for whether plaintiff waived any future suits based on this priority right, the court notes that the 1933 Act provides as follows:

SEC. 9. Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective pueblos for domestic, stock-water, and irrigation purposes for the lands remaining in Indian ownership. . . .

Although plaintiff did waive some rights by accepting additional compensation under the 1933 Act, section 9 expressly preserves plaintiff's ability to file suit based on the priority right to divert water. Thus, while there has been no final decision in *Aamodt* that would bind the parties regarding this matter, this court's interpretation of the 1924 Act combined with the years spent by the district court in examining this issue demonstrate to the court that plaintiff has alleged facts sufficient to support its claim and that plaintiff has given defendant fair notice of the claim as well as the grounds upon which the claim rests.

### 2. *Summary Judgment*

■ Plaintiff further argues that, based on the 1924 Act and the findings in *Aamodt,* there are no genuine issues of material fact and plaintiff is entitled to judgment as a matter of law on this claim. Defendant asserts that it is not bound to the fact findings and legal interpretations in *Aamodt* because the issue of whether a duty existed to purchase replacement land and water rights was not properly before the district court. Moreover, defendant points out that the district court has not issued a final decision on the Special Master's findings. Plaintiff acknowledges that there has been no final decision. Nevertheless, plaintiff asserts that, for all

intents and purposes, this issue has been decided and that the court may rule on the motion. Nevertheless, plaintiff then suggests that summary judgment may not be proper at this time and proposes staying proceedings on this claim until the district court issues a decision on this matter.

■ The general rule of collateral estoppel, or issue preclusion, in § 27 of the Restatement (Second) of Judgments (1982) states:

When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim.

The court has found that when defendant spent plaintiff's funds for the purpose of purchasing "land and water rights to replace those which have been lost," defendant became obligated to making sure that the lands purchased did in fact replace the lost lands and water rights, including the right to divert water form the Nambe–Pojoaque River System. This conclusion is based on the court's interpretation of the 1924 Act, the 1933 Act, and the 1937 Act, rather than by any decision made during the *Aamodt* litigation. Questions remain, however, as to whether defendant actually failed to fully replace the water rights and, if so, to what extent. The district court in *Aamodt* is in the process of addressing this issue but has not yet issued a final decision. The Special Master's findings alone are not sufficient to support plaintiff's motion for summary judgment. *See* Restatement (Second) of Judgments, § 27; *Matter of Lockard,* 884 F.2d 1171, 1174 (9th Cir. 1989). Therefore, plaintiff's motion is denied.

Nevertheless, once the district court in *Aamodt* issues a final decision on the extent, if any, of defendant's breach, such a decision may have a collateral estoppel effect in this case. At the very least, this court will benefit from the guidance of years of prior litigation on these issues. Therefore, the court will suspend proceedings on plaintiff's lost water rights claim pending the outcome in

*Aamodt.* *See, e.g., Stephenson v. United States,* 33 Fed.Cl. 63, 77 (1994) (indicating that the court denied summary judgment on plaintiff's taking claim and stayed further action pending a district court's determination of due compensation), *mandamus denied,* 66 F.3d 345 (Fed.Cir.1995).

## IV. *Subdocket D: Ramon Vigil Grant Claim*

In moving for summary judgment on this part of the case, plaintiff notes that, under the statute addressing the Indian Claims Commission's jurisdiction, defendant's dealings with plaintiff must be fair and honorable. Plaintiff claims that defendant's failure to obtain the entire Grant for plaintiff's benefit resulted in a breach of the fair and honorable dealings requirements. Defendant, in response, asserts that it is entitled to summary judgment because its actions were consistent with the fair and honorable dealings requirements.

The Fair and Honorable Dealings clause allowed any Indian tribe, band, or other identifiable group of American Indians to pursue claims against the United States that were "based upon fair and honorable dealings." 25 U.S.C. § 70a, cl. 5 (1976) (omitted 1978). In *Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 480 F.2d 831 (1973), the United States Court of Claims set forth the elements required to establish a breach of fair and honorable dealings. First, the government must have undertaken an obligation to plaintiff. *Id.* at 838–39. In addition, the government must have failed to meet its obligation. *Id.* at 839. Finally, plaintiff must have suffered damages as a result of defendant's failure. *Id.*

In determining whether defendant is obligated to benefit an Indian group in a certain manner, courts consider representations made by defendant's agents to the plaintiff. *Gila River Pima–Maricopa Indian Community v. United States,* 199 Ct.Cl. 586, 467 F.2d 1351, 1355 (1972). In *Gila River,* the government temporarily took over a portion of the Indian community's reservation in order to establish a Japanese relocation center. In allowing the government to do so, the tribal council relied mainly on statements from the superintendent of the reservation. The superintendent, an agent of the government, indicated that, in return for use of the land, the government agreed to develop a portion of it so that it would be fit for irrigation once the government returned the property. The government later decided to abandon development of the land because irrigation would interfere with other water users. In attempting to avoid compensating the Indians for the use of this parcel, the government pointed out that, under the specific terms of the contract, it had full discretion to decide how much of the land it would improve.

Despite this language, the Court of Claims focused on the fact that Department of the Interior agents consistently fostered the position that the government would develop the land as payment for its use. Furthermore, the Indians understood this as the government's position. Although the written agreement could have been interpreted to favor the government, the court noted that the case did not involve a compact between sophisticated commercial firms. Rather, the court emphasized that this was an agreement with Indians and would be read as the Indians understood it. The court concluded that it would be fair and honorable to provide full compensation for the government's omission. *Id.* at 1355.

The facts before the court are analogous to those in *Gila River.* In response to plaintiff's expressed interest in the entire Grant, the Commissioner of Indian Affairs, an agent of defendant, consistently indicated that the entire Grant would be purchased for plaintiff's use. In notifying plaintiff on January 8, 1935, about the status of lands bought for various pueblos under the FERA, the Commissioner stated:

> As the projects are approved by The Land Program, which, as a matter of fact, is a bureau under the F.E.R.A., an Executive order will be obtained from the President assigning the use of the lands to the various pueblos. It is true that we cannot tell what ultimate disposition future administrations may decide to make of these lands, or what pressure may be brought to remove them from pueblo use. However, I

feel that with a Presidential order assigning the use of the lands to the pueblos we will have a fairly good safeguard. Nevertheless, I do feel that your point is well taken regarding future administrations, and it has been my thought all along that as soon as the submarginal land work has been completed and the Presidential order promulgated, immediate steps will then be taken to have Indian title perfected to these land additions by act of Congress.[65]

While the Commissioner's statements do contain caveats, they also convey his optimism about pueblos' use of land purchased under the FERA program. On May 10, 1935, after defendant purchased the Grant, the Commissioner made further representations to plaintiff:

> The purchase of the entire tract was set up as a project under our purchase program, with the expectation that it will be assigned for the use of the San Ildefonso Pueblo. No change in this plan has been made, and it is still intended that this Pueblo will secure the use of the Ramon Vigil Grant, without the expenditure of any of their moneys in its purchase.[66]

The Commissioner also informed plaintiff that its use of the entire Grant would be somewhat restricted due to erosion problems and Spanish–American settlers' rights to graze livestock and cut wood on the Grant.[67] Although plaintiff acknowledged these concerns and agreed to share the use of the land,[68] plaintiff still believed that it retained a right to certain uses of the entire Grant. The Commissioner agreed with plaintiff's position, as demonstrated in his May 5, 1939, letter to the Secretary of the Interior:

> In the particular case of the Ramon Vigil Grant ... this was one of the grants bought for exclusive Indian use and then

surrendered by San Ildefonso Pueblo, with its eyes open, upon two conditions: that the "Sacred Area" as delimited by the Pueblo would be forever inviolate, and the residual 80 percent of the Grant should be used by the resident dependent population, *including the Indians*, regardless of race. There was an additional condition in the minds of the San Ildefonso Indians ... that *the Pueblo should have priority in the use of the dead and down timber upon the Grant as a whole.*[69]

Thus, when plaintiff lost use of all of the Grant lands except for the sacred area, it is not surprising that various agencies acknowledged defendant's change of position and the need to compensate for that change. For example, when the Rio Grande Committee recommended denying plaintiff the use of most of the Grant, it did so "with clear recognition of the fact that these grants were bought for Indian use" and that any extinguishment of the Indians' right to use these lands should be compensated.[70] In addition, in commenting on the impact of plaintiff's loss, the Solicitor for the Department of the Interior stated:

> The lands within these projects were found by the administration to be necessary for Indian rehabilitation and were in effect *promised by the Federal Government to the Pueblo Indians.* In one case at least action in reliance was taken by a Pueblo through forebearing to purchase the lands in question with tribal funds. The Interior Department may well be obligated to urge upon the Executive the necessity of recognizing the just claim of the Indians to the lands and of mitigating or avoiding the unfortunate effects upon the Indians and the Indian rehabilitation program of *diversion of the lands from their original pur-*

---

**65.** Joint Stipulation of Facts at ¶ 104 (Fed.Cl. Oct. 10, 1995); Pl.Supp.List of Ex. to Joint Stipulation of Facts at Tab 14 (Fed.Cl. Oct. 23, 1995) (containing a letter from Commissioner Collier to Mr. Oliver La Farge).

**66.** Joint Stipulation of Facts at ¶ 107; Def.Ex. 6153 (containing a May 10, 1935, letter from Commissioner Collier to a special attorney for the Pueblo Indians).

**67.** *Id.;* Def.Ex. 6114.

**68.** Pueblo of San Ildefonso Memorandum Brief in Support of The Pueblo's Motion for Summary Judgment on Issue of Liability of United States on Claims for Dishonorable Dealings in Docket 354–D at 11; *see also* Pl.Resp. at 6.

**69.** Pl.Ex. 179 at 2 (emphasis added).

**70.** Pl.Ex. 177 at 3.

*pose without provision for substituted resources.*[71]

In attempting to establish defendant's obligation, plaintiff claims that assurances from the Commissioner of Indian Affairs obligated defendant to reserve the entire Ramon Vigil Grant for plaintiff's *exclusive* benefit. Plaintiff acknowledges, however, that it agreed to allow non-Indians to use the Grant lands except for the sacred area.[72] This undisputed fact prevents the court from finding defendant obligated to give plaintiff exclusive use in the Grant.

Defendant argues the other extreme: that it was under no obligation because the Commissioner could not guarantee Congressional legislation in plaintiff's favor given his position in the government. Furthermore, defendant claims that its duties to plaintiff do not extend to enacting particular legislation. As support for this proposition, defendant cites *Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, 1964 WL 8624, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). In *Oneida,* the government established a reservation for the Tribe through a treaty. Certain tribe members misused forested areas and the Tribe sued the government, claiming it was obligated to protect the timber resources. After examining several options, the court concluded that the government's only recourse would be to enact legislation, such as a criminal statute or an act allotting the reservation land to individual tribe members. The court held that requiring defendant to enact new substantive legislation goes beyond the standards set for a fiduciary. *Id.* at 499–500.

The *Oneida* case, however, did not involve consistent representations from defendant's agents, as does the case before this court. Moreover, defendant would not have been required to enact new substantive legislation in order to provide use of the entire Grant. Rather, legislation was already in place, such as the act establishing the FERA—the same

legislation that defendant used to obtain the Grant before changing its plans. Given these distinctions, the court's proper focus is on whether defendant's agents fostered a particular position and whether plaintiff relied on that position. *Gila River,* 467 F.2d at 1355. Comments from defendant's own agencies made before, during, and after the purchase indicate that defendant purchased the Grant with an intent to allow plaintiff to use the entire Grant to various degrees. These comments also demonstrate that plaintiff relied on representations of defendant's agents in support of its position. Such a conclusion is further supported by the fact that this case involves an agreement with an Indian Pueblo rather than a sophisticated commercial entity. *Id.*

Therefore, the court finds that defendant undertook an obligation to provide plaintiff with use of the entire Grant, although that use was not intended to be exclusive or unrestricted. The promised use includes exclusive use of the sacred area. Furthermore, plaintiff's use of the remaining Grant lands would have been limited by defendant's erosion concerns and by non-Indians' rights. Moreover, it is undisputed that plaintiff did not gain the use of any of these lands except for the sacred area granted under the 1949 Act.[73] As a result, plaintiff's damages constitute the loss of its limited use of the remaining Grant lands. Accordingly, it would be fair and honorable to compensate plaintiff for the value of that lost limited use.

*Conclusion*

Under subdocket A, the court finds that the 1924 Act authorized the Board to compensate for trespasses suffered before plaintiff lost its land and water rights to the trespassing settlers. While plaintiff received $61,499.33 in compensation plus additional amounts,[74] it is not clear from the record whether the Board factored in trespass damages as a part of that compensation. Assum-

---

71. Pl.Ex. 178 at 6 (emphasis added).

72. Pl.Brief in Support of Summary Judgment in Docket 354–D at 11; Pl.Resp. at 6. This is consistent with the Commissioners' May 5, 1933, comments to the Secretary of the Interior. Pl. Ex. 179 at 2.

73. Joint Stipulation of Facts at ¶ 119.

74. J.Stip. of Facts at ¶ 55.

ing, *arguendo,* that the Board failed to do so, plaintiff should have raised this issue before waiving further compensation pursuant to the 1933 Act. Because plaintiff abandoned further claims under the 1924 Act, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted.

Concerning subdocket B, the court finds that the purposes for which defendant spent plaintiff's funds comply with the 1924 Act. Regardless, defendant's accounting does not sufficiently support $19,178.91 of these expenditures. Furthermore, plaintiff has established that defendant failed to account for $112,772.98 in collections made for the rental of plaintiff's land and the use of plaintiff's sand and gravel. Accordingly, plaintiff is entitled to a judgment of $131,951.89 in subdocket B.

As for the portion of subdocket C addressing defendant's duty to make assets productive, defendant's motion to dismiss for lack of subject matter jurisdiction is denied. Nevertheless, defendant's motion to dismiss based on plaintiff's failure to state a claim is granted in part. Specifically, the court finds that defendant is not liable for interest that would have accrued from the trespasser rental fees claimed in subdocket A. The court, however, denies defendant's motion in part given that plaintiff has established defendant's duty to invest funds due in subdocket B. Accordingly, plaintiff's motion for summary judgment is granted in part, in that defendant is liable for interest that would have accrued. The parties are directed to file a stipulation as to the amount of damages in this part of subdocket C by July 15, 1996.

For the remainder of subdocket C—plaintiff's lost water rights claim—defendant's motion to dismiss is denied. Plaintiff's motion for summary judgment is also denied. Additional proceedings are suspended until further order of the court. The parties are directed to file joint status reports advising the court as to the status of proceedings in the *Aamodt* case before the District Court of New Mexico at 90–day intervals. The first joint status report shall be filed September 4, 1996.

Regarding subdocket D, the record before the court indicates that defendant took on the obligation to provide plaintiff with the use of the Ramon Vigil Grant. Specifically, defendant promised exclusive use of the portion identified as the "sacred area" and limited use of the remainder, as determined by defendant's environmental concerns and non-Indians' rights. Defendant, however, ultimately granted use of only the sacred area. Therefore, under the Fair and Honorable Dealings clause, 25 U.S.C. § 70a, defendant must compensate for the limited use of the remaining Grant lands promised to plaintiff. As a result, defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted to the extent described above. The parties are directed to file stipulation as to the amount of damages in this subdocket by July 15, 1996.

IT IS SO ORDERED.

